Mary E. Hess, Appellant, v. O. G. Hess, Administrator, et al., Appellees.

**MARRIAGE:** Common-Law Marriage—Insufficient Evidence. Evidence reviewed, and held quite insufficient to establish a common-law marriage.

*Appeal from Mahaska District Court.*—Henry F. Wagner, Judge.

MARCH 15, 1921.

Action by Mary E. Hess, plaintiff, claiming to be the widow of James O. Hess, who died intestate on January 25, 1919, by

virtue of a common-law marriage, to establish her dower interest in his estate. The court below found that plaintiff was not the widow of James O. Hess, deceased, and was not entitled to a distributive share. Plaintiff appeals. Facts in the opinion.— *Affirmed.*

*Dan Davis* and *McCoy & McCoy,* for appellant.

*D. C. Waggoner, L. T. Shangle,* and *Malcolm & True,* for appellees.

ARTHUR, J.—The issue involved was whether or not appellant was the surviving spouse and widow of James O. Hess, deceased, and as such, entitled to a widow's share in his estate.

Plaintiff based her claim upon an alleged common-law marriage, which she claims was mutually entered into between her and James O. Hess on or about April 20, 1914, in the presence of her children; and she sought to prove this express contract of marriage by the testimony of herself and her son, Dewey Gwyn.

Defendants denied that such marriage contract was entered into. Defendants further say that plaintiff was the undivorced wife of Marion Mefford, and incompetent to enter into a contract of marriage with defendant; that a decree of divorce between plaintiff and Mefford was void, because it had been obtained by default, without any notice on Mefford.

Replying, plaintiff claimed that defendants were estopped from questioning the Mefford divorce, because James O. Hess had paid the costs and attorney fees for obtaining the Mefford divorce, and because, previous to the divorce, James O. Hess had made a contract with plaintiff in settlement of alimony due her, and borrowed the money from his mother, who is a party defendant herein. The court found that "there was no common-law marriage between plaintiff and James O. Hess, deceased, and that plaintiff is not the widow of said James O. Hess, deceased," and dismissed plaintiff's petition.

Plaintiff claims that this is an equity case, and was, by agreement of parties, transferred to the equity docket and tried in equity. Defendants insist that it is an action in probate, and

therefore at law. Manifestly, the action is one at law; but it seems to have been tried in the court below, by agreement of parties and order of court, as an equitable action, and we see no reason for not treating it here as tried below. All the difference we perceive is that, if it should be considered as a law action, the finding of the court below would have the force and effect of a verdict of a jury, and, if entertained as a cause in equity, we must determine the case on the evidence.

The testimony is very voluminous, and we will not attempt to set it out at length. We have examined the testimony carefully, and come to a conclusion in harmony with the court below.

Plaintiff and her son, Dewey Gwyn, testified to an oral agreement of marriage between plaintiff and Hess on the 20th of April, 1914. Manifestly, plaintiff was incompetent to testify to the marriage agreement. After a careful examination of the record, the truth must be announced in all its nakedness. The story told of the second marriage of plaintiff with James O. Hess is unbelievable. There were introduced in evidence many letters written by plaintiff to James O. Hess, after she claimed to be remarried to him, which negative, and in fact contradict, her claim that a marriage contract was entered into.

In the fall of 1913, James O. Hess, who was a bachelor, 41 years of age, left his father's home, in which he had lived up to that time, and set up a home for himself on a small farm owned by his parents. This plaintiff, whose name was then Mary Mefford, had, in January before, obtained a divorce from Marion Mefford, her husband. She and her three children went to live with James O. Hess, where she acted in the capacity of housekeeper for him until January 14, 1914, when she and James O. Hess were married. They lived together about ten weeks, when Hess brought suit for a divorce, and secured a divorce from her on April 8, 1914. He paid her $500 alimony in cash, and furnished support for a time, and agreed to move her goods and effects to Oskaloosa. On April 18th, Herman Hoover, a near neighbor, went with Hess to move his property to his father's place, where Hess had been staying after the separation. In Hoover's presence, plaintiff and defendant quarreled in dividing up their goods. Right away after this, Hess, in accordance with his agreement to move her goods to Oskaloosa, moved plain-

tiff and her household goods to the depot in Oskaloosa, and she shipped them to Grinnell, Iowa. The 20th of April, 1914, when James O. Hess went there to move her away, in accordance with his agreement, is the date on which plaintiff claims they entered into a common-law agreement of marriage. If there was no agreement of marriage entered into between them at that time, there was no marriage. After this alleged marriage, plaintiff moved to Grinnell, and James O. Hess remained at his father's home. After plaintiff had moved to Grinnell, she wrote Hess 11 letters, which were introduced in evidence. These letters cover a period of 4½ months immediately following this so-called marriage contract of April 20, 1914. In not one of these letters does plaintiff address Hess as her husband, or refer to herself, by signature or otherwise, as his wife. In not one of the letters does she allude to or mention in any way their marriage, but instead, we find her using language contradictory of her claim that she and Hess had been remarried. In a letter dated May 4, 1914, just two weeks after she claimed that she and Hess entered into a marriage contract in the presence of her children, in speaking of their old neighbors she says, "They have got us just where they made their brag they would." It seems that Hess had written her about some man whom he suspected as being her suitor, and in this letter she says, "When I haft to fall back to New Sharon fellows, you tell me about, will you please?" and "I think it would pay that New Sharon fellow to get a room and board up here, don't you?" and again, "I am not caring for gentlemen company very much; I know one thing well, that the next move I will make will be so far away from the old toadstools down there they will lose out entirely." In September, she addressed Hess, saying:

"Jim, your letter received this morning. I am not looking for gentlemen company, but if you want to come up tomorrow, all right. You will always find me here at home."

In this letter, it will be observed that plaintiff was not looking for "gentlemen company," but was giving Hess permission to come and see her. In another letter she says:

"Why didn't you take me to the Old Settlers at Lynville? You had others to take. I know one thing, I am going to know one way or the other pretty soon, for I am not going to stay

in town next year; I have got several notions in my mind, and I am going to decide on one or the other of them pretty soon, and work to it.''

This entire letter indicates that, instead of being married to Hess, plaintiff was trying to induce him to marry her again, and was dissatisfied with his not giving her a definite answer. We will not pursue her letters further; but suffice it to say that the letters prove conclusively that no agreement of remarriage was entered into at any time between these parties.

Millard Wareham, witness, testified that he had a conversation with plaintiff on the day Hess died, in which she said, ''Tomorrow would have been our wedding day.'' She said that she had her wedding dress made, and would wear it out to see Jimmie tomorrow; that she wanted to get some money out of O. G. Hess (administrator, appellee), and ''asked me if I didn't have influence with him, and couldn't I help her, and I said 'On what grounds?' and she said she wanted to get a board bill out of O. G. Hess.''

Oscar Carmein testified that, the Sunday after Hess's death, plaintiff told him that she was to have been married to Hess the day he was buried.

According to the testimony of some four witnesses, Dewey Gwyn said to them, on the night after Hess's death, that his mother and James O. Hess were to have been married in a couple of days; and Dewey never mentioned to anybody, until he came on the witness stand, some five years later, anything about a marriage contract entered into April 20, 1914. The testimony of Dewey Gwyn as to a marriage contract entered into on April 20, 1914, is contradicted in so many ways by disinterested witnesses and the stories told by him and his mother are so unreasonable and so contradicted by their own acts and conduct and by the woman's own letters that we refuse to believe, as did the court below, that the marriage agreement claimed by the plaintiff was entered into. The testimony shows that there was an intermittent cohabitation, but we are constrained to find from the record that the cohabitation was not in pursuance of an agreement of marriage; that it was meretricious, and does not establish marriage.

Having come to the conclusion that plaintiff failed to es-

tablish a common-law marriage, we do not deem it necessary to discuss the validity of the Mefford divorce, to determine whether or not plaintiff was still the undivorced wife of Mefford. The record warrants the finding of the court below that there was no common-law marriage, and the judgment of the lower court is—*Affirmed.*

EVANS, C. J., STEVENS and FAVILLE, JJ., concur.