EMMA LEOPOLD HOESE, Appellant, v. FRANK HOESE, Appellee.

FEBRUARY 14, 1928.

*John A. McKenzie* and *Scott M. Ladd*, for appellant.

*Roseberry & Roseberry*, for appellee.

MORLING, J.—We find ourselves unable to hold that the plaintiff has proved a mutual agreement between herself and the defendant to presently assume toward each other the relationship of marriage. We shall, therefore, limit our discussion to the evidence bearing on this subject. For our more recent cases on the subject see *In re Estate of Medford*, 197 Iowa 76; *Hess v. Hess*, 191 Iowa 52; *Love v. Love*, 185 Iowa 930; *Pegg v. Pegg*, 138 Iowa 572; *Brisbin v. Huntington*, 128 Iowa 166. Common-law marriages do exist. Concubinage also exists. That the plaintiff was employed at first by defendant as a housekeeper, that no public marriage ceremony was ever performed, that there was no public acknowledgment in any form of matrimonial relations, but that they maintained sexual relations with each other for at least twelve years (plaintiff claims nearly thirty), is admitted.

In the early part of 1894, defendant was engaged in working a large farm. He employed a variable number of hands, and had had a number of housekeepers. He was about 28 years old, single. Plaintiff had lived in Chicago, St. Paul, and Cincinnati. She was about 24 years old, had been married, but had deserted her husband. She testified that she was a widow on May 5, 1894. She had a three and a half-year old boy. Her family resided in defendant's vicinity. Through them defendant, about March 1, 1894, employed plaintiff as a housekeeper. Plaintiff and defendant had no acquaintance before that time. Plaintiff claims that, on May 5, 1894, she became defendant's common-law wife. She says that, just prior to that date, defendant began courting her, showing affection; that one night defendant insisted on getting in bed with her; that she resisted, and he apologized; that he began showing affection again, and one night, after mutual exhibition of affection:

"Finally he says, 'I want you to marry me.' * * * Finally I said, 'Well, I am willing to marry you.' * * * Then I asked him, 'When will we be married?' and he said, 'Well, we couldn't be married right away,' he said on account of his business affairs, he would have to keep it a secret. * * * He said for me

to keep it a secret. I told him I thought we couldn't keep it a secret, and then, later on, I said, 'Maybe we can;' but I asked him where would we get married, and who would marry us. He said it wasn't necessary to have anybody marry us,—when we agreed to be married, we are married. Q. What did you say to that? A. I said I didn't think that looked right; I thought we ought to be married in a regular way. Q. What did he tell you about that, if he said anything further? A. He said that was all right; he said it was right,—he knew it was right. He says, 'We can have a ceremony performed later on, if we want to.' * * * We talked a long time that night about it. * * * I told him,—I said I didn't think that marriage was good. He said it was good, and he knew it was good, and he kept talking to me. Well, I thought the matter over. I thought whatever he said was all right. I had a lot of affection for him, and I says, 'Well,' I said, 'if it is all right with you, it is all right with me.' 'Well,' he says, 'then we are married. We agree to be married, and we are married right now.' Q. What did you say? A. I says, 'All right, then, we are married.' * * * We slept together that night after we had that arrangement. He slept in my bed for a while, then went over to his own.''

The precision of language claimed by plaintiff to have been used by both of them thirty years before, each clearly expressing a present assumption of the marital status,—''we are married,''—arouses skepticism. According to the testimony of each of the parties, each was first approached by the other for the sexual purpose. Defendant says that their relations started with his finding her in his bed one night, and being invited by her to come in. There is not a word of evidence to show the exhibition of conjugal love or affection by either toward the other after the showing of affection which plaintiff claims to have occurred before she submitted. According to plaintiff's testimony, defendant's calls upon her were for sexual gratification. Plaintiff testifies:

''I occupied one room downstairs, and he the other. He would always call me into his bed, because my baby was in my bed. * * * Went to his bed whenever he called me.''

Defendant, like a true son of Adam, says it was the woman who tempted him. It was always at her instance that they engaged in sexual intercourse. He denies that there was ever any

talk of marriage. Parenthood seems never to have been considered. Plaintiff, in her petition in the breach of promise case later referred to, admits conception at six different times; but on her statement, they were not only not wanted, but were ended by illicit means. Plaintiff says that she was insisting repeatedly upon performance of a marriage ceremony; that an arrangement was made whereby, about June 12, 1894, the ceremony was to be performed at Sioux City. Her brother and sister were to go with her. She testifies that on that day defendant said he "got letter from his sister, if he married me, would have to pay all her money back, and she wouldn't let him have more money. * * * Said we couldn't be married now. Maybe later on." According to plaintiff's case, the one reason at all times given by defendant, and without specification, was, in substance, the same: "On account of his business affairs he would have to keep it a secret."

As will be seen, it is a part of plaintiff's case also that her alleged marriage to defendant was known to her mother, to her brother and his wife, and to her son; and that she proclaimed it to a supposed rival about 1906.

The brother testifies that he heard rumors, after plaintiff had been in defendant's employ about two months, complained about them to plaintiff and defendant, and insisted upon a public wedding; that he and his sister were invited by defendant to the ceremony, which was to have taken place June 12, 1894. He testifies to substantially the same reason given for postponing the ceremony as that given by plaintiff. He testifies to having seen plaintiff and defendant in bed together; that, in 1909, defendant occupied a room in his house, and plaintiff would come over about every other night and stay with him.

"Heard their conversations several times. Sometimes they got along all right for a week,—everything lovely,—then they would break out and have awful fuss again. Several times, heard them quarreling. Got pretty mad sometimes, and talked pretty loud. Wife and I could hear every bit of it, practically. Heard her say on different occasions she wanted public wedding. One time he says: 'We were married; you know we were married. Where you fell down, when you sued me for that breach of promise case. I beat you that time; I can beat you again * * * '"

Plaintiff was occupying an adjoining house. This brother says he figured they were married. A number of witnesses, apparently disinterested, testified to scurrilous statements made by this brother concerning the plaintiff, her history, and her relationship with the defendant. There is no foundation for the charge of immorality which he made against his sister save her relations with defendant, which in his evidence he now claims were matrimonial. The brother's wife testifies to observing and hearing the same things; that:

"She [plaintiff] continued to visit him [defendant] in his room; came two or three times a week; stayed about same length of time. * * * Ventilator in floor. Could at times hear distinctly what they said, if I listened. * * * Heard her say she would like a public wedding ceremony performed. He said it was all right; they had agreed to be man and wife, and they would be married later on,—have a wedding in the spring. Heard her say he should support her more than he had been. He said he wouldn't support her any more than he had been. * * * Would not have let them live together that way in my house, but for fact knew about secret marriage."

These occurrences are claimed to have been from 1909 to 1911. This witness also says that, on these occasions:

"Heard her talking about this secret agreement of marriage, —that they were man and wife, had agreed to be man and. wife, —and that he should do more for her than he had been doing."

Plaintiff's son testified that he in early years slept with his mother; that, when he was 8 or 9 years old, he remembers his mother's being in Hoese's room part of the night.

"Heard them quarreling or talking quite loud one night. Heard mother say she wanted regular ceremony. Hoese said wasn't necessary; they were just as much married as any other man and wife. Referred to public marriage. * * * Next day went with Hoese to field; asked him if he was really married. He says, 'Where did you hear that?' I said, 'I heard you quarreling last night in your room.' He says, 'We are married; don't say anything more about it.' "

Says he heard these quarrels once every two months. In 1920, the son, while he and plaintiff were living at Omaha, called defendant down there. The son testifies that defendant then said that "at one time they had secret agreement of marriage,

but that she had started a breach of promise case and upset that; he would have married her if she had not started that case. Said had an agreement of marriage,—impression I got from that statement. * * * He said didn't think at that time he could marry her, account various reasons relation to his business; that he had lived that long with her in that way, and if he would marry her then, it would rather make a fool out of him.''

A number of witnesses give testimony to statements made by this son, tending to show a blackmailing purpose and an effort to suborn witnesses. During all the time in controversy, defendant lived in Merrill, a town of about 650 population. The testimony tends to show that there was more or less report in the town that these parties maintained a meretricious relationship, but none that they were considered as husband and wife, notwithstanding that their ''secret'' was in the possession of the persons previously referred to. Defendant had provided a house for plaintiff before 1906. In 1906, plaintiff filed in the Plymouth district court two sworn petitions. The occasion of them was, as she says:

''One summer he got to chasing around with Kate Wilters, of Merrill. When quarreled with him about keeping company with her, he got mad, cussed, and kicked door in. Went to bank to ask him for money; he sitting at desk, with arms around her. I said: 'If you two get married, I will blow both your brains out. You can't marry her, because we are married.' After that he left my place. Came to Sioux City, hunted job.''

It will be noticed that plaintiff's statement, according to her testimony, was, ''If you two get married, I will blow both your brains out.'' Then she said, ''You can't marry her, because we are married.'' The reasonable explanation of the inconsistencies of statement is that the latter is an afterthought. That she was not then claiming matrimonial rights is shown, not only by her failure to demand them, and her going to Sioux City to hunt for a job, but by her two petitions. In one petition plaintiff alleges that defendant gave a house in Merrill to plaintiff, which plaintiff accepted and made her homestead; that, about June 15, 1906, the defendant by fraud and stealth entered the house, ''and the defendant is a trespasser by reason thereof.'' In that petition plaintiff asked that her title be quieted, and she decreed to be entitled to the absolute possession thereof, and that the

defendant be removed therefrom. She was claiming to quiet the title to her home against the man whom she now claims to have been then her husband, and to exclude him therefrom as a trespasser. In the other petition she alleged that, on or about January 1, 1893, she went upon defendant's farm to act as housekeeper for him, and for about three years was paid her wages.

"That, soon after coming upon the said farm, it was verbally agreed between this plaintiff and the defendant that they would be married at some time thereafter; that soon thereafter, and by reason of said understanding and agreement to marry, this defendant seduced the plaintiff, and thereafter, for a period of about twelve years, lived with this plaintiff and cohabited with her."

Also:

"That, as the result of said relations, this plaintiff became in the 'family way' six different times. That this defendant counseled and advised this plaintiff to make away with said conceptions. That as the result of said premature births this plaintiff became broken in health, and her health permanently impaired thereby."

In this petition plaintiff alleged further that defendant "refused to carry out his contract of marriage heretofore referred to; that defendant, upon being upbraided on or about said time as to his attention to a certain young woman in Merrill, informed this plaintiff that she 'had no strings on him, and he would go with whom he pleased;' that by reason of all of the above plaintiff has suffered much mental anxiety, her health has been permanently injured, she has suffered the loss of a good home, which defendant was abundantly able to give her, and has lost her social position thereby;" and that she was damaged to the amount of $100,000, for which she claimed judgment. In the first case a written agreement was signed by plaintiff and defendant, by which a default rendered October 9, 1906, was to be set aside, "because the plaintiff makes no claim to the property named in said petition, and because she had informed this defendant, prior to the beginning of said term of court, that he need not pay any attention to said action, as she did not intend to proceed or go any further with it."

It was agreed that the cause should be dismissed. Another agreement was made in both cases, by which they were to be

dismissed; "and all claims, if any, existing in favor of the said plaintiff against the defendant having been fully settled by compromise * * * ," it was agreed that the petitions be withdrawn from the files.

On October 12, 1906, the plaintiff signed a statement that: "Frank Hoese, defendant in the case of myself against him, never promised to marry me, nor did he or I ever enter into any agreement of marriage, and the question of marriage was not talked of between us. And I so informed my lawyer, H. A. Evans, and he had no right to state it in my case No. 9990 against Frank Hoese."

On November 9, 1906, another agreement was signed by plaintiff and defendant, and acknowledged, reciting that plaintiff has made certain claims against defendant in an action in which plaintiff claimed an interest in a house, "and also in another action claimed the sum of $100,000 from the second party by' reason of breach of promise of marriage, seduction, and abortions * * * and all which claims the said Frank Hoese denies, and the said first party also denies any such promise of marriage, seductions, and abortions as alleged in said actions; now, therefore, for the purpose of full settlement, by way of compromise, of all such claims and demands * * * or any other claim or demand of whatever nature, which the said first party has or claims to have, the second party agrees to pay to the first party," and the first party agrees to accept, $100 in full settlement; and it is further agreed that the above agreement embodies and contains all claims and demands which the first party may have against the second party. This agreement was acknowledged by both parties. On the same day, another agreement, signed and acknowledged by both plaintiff and defendant, recited that the plaintiff agreed to accept $200 "in full settlement, by way of compromise, for all wages and services heretofore rendered by the first party to the second party," and defendant agreed to pay her that sum therefor.

Plaintiff's explanation is that she met defendant at a hotel in Sioux City; that defendant "wanted me to drop case. He said: 'Em, you drop those, and everything will go on just the same as before. I will do everything in the world for you. You will never have to want for anything.' Told me didn't have anything more to do with Wilters woman. I said, 'Then it is

all right; if you have dropped her, it is all right.' * * * Talked about suit. Wanted me to sign papers. Don't know what was in papers. They took papers, after I signed them. Papers written when they got there. Signed them just as they were. Two weeks later, signed other papers. Signed them at Kass' office, Hoese's attorney, in Sioux City. Don't know what was in papers. Kass asked me to sign; Hoese there.''

It will be noticed that, according to her testimony, the cases were settled not on the basis of matrimonial rights.

Defendant provided three houses at different times for plaintiff. The last one was built by plaintiff, and paid for by checks drawn on defendant's bank. Plaintiff says:

''I moved in there. He said, 'Now, Em, I am going to give you $40.00 a month for you and Margarite,—do you think you can live on that?' I says, 'Will try to, I think I can,—I will have to be awful saving.' I was satisfied. He says, 'You will have the home and $40 a month.' ''

Margarite is the plaintiff's adopted daughter, who will soon be referred to. Neither the house nor the support was claimed or agreed upon by reason of any marital relationship.

Plaintiff says that in 1923 she asked for a deed; that defendant ''said Joe [plaintiff's son] making demand for deed. He called him a thief. I went down later on again, and asked him for the deed. He says: 'Got your deed. Here is your deed, and that's all you are going to get.' * * * Had supported me and little girl up until time of operation,—up until time I got deed. He didn't support me after I got deed. Asked him for support. * * * I says, 'Frank, if you give me $50 a month for me and Margarite to live on, that's all I want as long as I live.' He wouldn't do it. Didn't give me anything at all after that. Went to his room after that; wanted him to do right thing with me. Told him he should marry me, the way he ought to. I seen he wouldn't do anything I asked him to do. I quit,—I says, 'All right, I won't do another thing for you.' He said, 'That's all right.' He said he wouldn't do anything for me,—wouldn't give me any more money to live on. He didn't have anything further to do with me after I got my deed, in October, 1923.''

It will be noticed that, on plaintiff's statement here also, these demands were made not by reason of any claimed matrimonial right. Her testimony is:

"Maybe thirteen years, maybe more and maybe less, prior to beginning of this suit, that Frank Hoese did not room at my place. He left my house when had trouble with Kate Wilters, in 1906."

Defendant, about the time of the settlement of the two suits, dictated a fulsome commendation and exoneration of himself, which plaintiff at his instance had published.

She testifies that, after the settlement of 1906, she continued to take care of defendant's room, to do his washing, and to furnish him food. She also says that they continued their sexual relations. Defendant denies having sexual intercourse with her after the breach of promise case was commenced.

Shortly before or after 1906, plaintiff made a trip to a number of western cities. She says defendant furnished her money. She also says that she was employed at those places.

On June 8, 1910, plaintiff signed and acknowledged an agreement adopting Margarite, previously referred to. This agreement recites:

"That Mrs. Emma Leopold, of Merrill, Plymouth County, Iowa, being of the age of majority, and a widow, is desirous of adopting as her own child, Margarite * * * "

It was agreed that Margarite should be known as Margarite Lucille Leopold. Plaintiff testifies, with regard to this adoption:

"Hoese said, 'You adopt her and take her, and you will never have to want for anything.' I didn't have any means of support. Believed he would maintain me. Hoese told me to go to attorney. Had attorney draw up papers, and recorded them."

It seems that a census report when she was 53 years old gave her as a divorcee. Plaintiff says she does not remember if she told the census taker that. She gave him her name as Emma Leopold. On February 27, 1926, she signed and acknowledged a deed as "Emma Leopold, grantor and unmarried." Plaintiff never took to herself defendant's name, except in bringing this suit.

The parties never accompanied each other in public, except that once they went to a ball game, and once to a circus. They never appeared together, or were known or introduced as husband and wife, except that plaintiff testifies that, at the time of

the settlement in Sioux City, they registered at two hotels under assumed names as husband and wife. This is denied by defendant. Defendant made a large number of deeds, said to be 26, in all of which except two he was named as a bachelor, or unmarried. The two which he says were not written by him, and which he signed without reading, did not mention his status.

Plaintiff's counsel argue that the numerous releases, the newspaper article, the gift of the houses, and defendant's other activities, indicate a guilty conscience. Defendant on his own admissions had enough cause for guilty conscience, and also to make a sure settlement, though there was no marriage agreement.

What defendant did, on his own statements, in the way of furnishing houses and support, in comparison with his fortune, estimated by plaintiff's counsel on good grounds at $750,000, is little enough. Counsel argue that defendant's testimony that he had no sexual intercourse with plaintiff after the breach of promise case, though plaintiff was regularly going to his room, is not believable. Notwithstanding the doubtfulness of much of defendant's testimony, the circumstances, including plaintiff's recorded and sworn acts, contradict her affirmation, and support defendant's denial of the alleged marriage contract. Counsel also say that plaintiff was ill advised in bringing her former actions, and mistook her remedy. We cannot so assume, or accept her statement that she did not know what was in the papers. She knew the facts then as well as she knows them now. She put her version of them in writing, and swore to it.

The evidence occupies 240 pages of the abstract. We have undertaken only to outline its important features. The question presented is one of fact. A more complete detail would serve no useful purpose.—*Affirmed.*

STEVENS, C. J., and DE GRAFF, ALBERT, and WAGNER, JJ., concur.