BEULAH GAMMELGAARD, appellee, v. CHRIS GAMMELGAARD, appellant.

No. 48938.

(Reported in 77 N.W.2d 479)

June 19, 1956.

William O. Anderson, of Estherville, for appellant.

Daniel D. Sanderson, of Estherville, for appellee.

Thompson, J.— ▮ The major question involved in the case at bar is factual. It concerns an alleged common-law marriage between the parties, the existence of which the plaintiff asserts and defendant denies. No other form of marriage is claimed; so plaintiff's case must rest upon proof of the common-law relationship. The burden to establish the marriage is upon the one who asserts it. Pegg v. Pegg, 138 Iowa 572, 576, 115 N.W. 1027, 1029.

▮ Common-law marriages are recognized as valid in Iowa. In re Estate of Stopps, 244 Iowa 931, 57 N.W.2d 221, and cases cited. To establish the existence of such a marriage there must be shown a present intent to be husband and wife, followed by cohabitation. Pegg v. Pegg, supra, at page 575 of 138 Iowa, page 1028 of 115 N.W.; State v. Grimes, 215 Iowa 1287, 1289, 247 N.W. 664, 665. Proof of cohabitation is not in itself sufficient. In re Estate of Medford, 197 Iowa 76, 78, 196 N.W. 728. But such proof, as well as evidence of conduct and of general repute in the community where the parties reside, is admissible as tending to strengthen a showing of a present agreement to be husband and wife, and as bearing upon the question of intent. In re Estate of Wittick, 164 Iowa 485, 493, 145 N.W. 913, 916. These principles of law are well established, and there is no real dispute between the parties concerning them. The fighting point in the case is the plaintiff's assertion that there was a present intent of the parties to be husband and wife, and the defendant's vigorous contention that evidence fails to establish it. Cohabitation is amply proven.

We turn then to a consideration of the evidence on the question of intent and agreement in praesenti. It will not be possible to analyze in detail all the evidence which the parties adduced as shown by the 220 pages of the record. The trial court, after considering it, was of the opinion plaintiff had shown the necessary elements of a common-law marriage and entered judgment for her accordingly that she have a divorce from the defendant with alimony and costs, including fees for her attorney. The propositions relied upon for reversal are two: That there was a failure to show a common-law marriage, and that no showing of the financial status of the defendant sufficient to warrant an allowance of alimony was made. There is no contention that the evidence was insufficient to require a divorce upon the pleaded ground of cruel and inhuman treatment such as to endanger life, if there was in fact a marriage relationship.

I. While the burden of proof was at all times upon the plaintiff to establish her case, it must be said the attitude of the defendant as shown by the record falls considerably short of reaching a high standard of commendability. He admits cohabitation with the plaintiff for more than twelve years, and repeated acts of sexual intercourse; but it is his contention that these relations were at all times meretricious, illicit and lewd. If he is to be believed, the parties from 1940 until almost the end of 1953 lived not only in sin, but in defiance of the criminal laws. He who must defend by pleading moral guilt, by saying "This woman was not my wife but my mistress" cannot expect his position to be applauded. It will not appeal to a court of conscience. True, he may be reflecting merely the actual situation as it existed, and, if so, he is entitled to the rights the law gives him. We have said: "Common-law marriages do exist. Concubinage also exists." Hoese v. Hoese, 205 Iowa 313, 314, 217 N.W. 860. But, considering the natural inclination of most people to obey the laws both of God and man, it seems a fair conclusion that the courts, in doubtful cases, will prefer that construction of the evidence which finds a legitimate marriage rather than a long period of lewd and criminal cohabitation. See section 725.1, Code of Iowa 1954. The parties here were in all other respects law-abiding citizens; a holding

that they were so in their relations with each other, if the evidence warrants it, will be much more in accord with their demonstrated good characters in all other activities. It is a reasonable inference that their natural inclinations would have been to obey the law.

The plaintiff and defendant were married in 1927, and this union continued until 1939, when a divorce was granted to defendant. Plaintiff had previously been married and divorced. By this earlier marriage she had three sons, who made their home with her and the defendant on a rented farm near Ringsted, Iowa. One son, Thomas, was born to the parties litigant in 1928. After the divorce in 1939 one of the plaintiff's sons, Robert, and Thomas remained with the defendant on the farm. Plaintiff operated a café in Armstrong for a few months following the separation, then took charge of a rooming house in Emmetsburg. While she was so engaged in April of 1940, she testifies that defendant came to her and proposed marriage, and she accepted. She says that while she could not, in 1954, the time of the trial, remember the exact words used, the substance was that they would be husband and wife from that time on; and that the marriage was consummated that night in her home. The defendant denies any such conversation or agreement, but admits acts of intercourse, which he says had continued intermittently from the time of the divorce.

The plaintiff had other employment for short periods in 1940, at or near Harlan and Dubuque. It appears she did not permanently return to the farm home near Ringsted until the late summer or fall of 1940. From that time on the parties lived on the farm until 1951. During this time, while plaintiff contends she was defendant's wife and he asserts she was his housekeeper and concubine, she kept the house, drove a tractor in the fields, hauled manure, helped with the chores, and did other work outside her household duties. In 1951 the defendant held a closing-out sale on the farm, purchased a home in Ringsted, and the parties moved there. In July of the same year defendant bought an interest in an implement business in Britt. The plaintiff remained in Ringsted until November, when they rented a house in Britt and lived there until April of 1952, when the lease ex-

pired and plaintiff moved back to the home in Ringsted. During this time defendant returned to the home week ends and at other times, and the parties continued to cohabit as they had before. Defendant paid all the expenses of the establishment. About Thanksgiving of 1953 trouble developed because of real or fancied attentions paid by defendant to other women, and this action resulted in 1954.

It is an obvious impossibility to detail all the evidence adduced or to discuss the many contentions made. Nor would the effort be helpful. Each case of this sort, as in all divorce cases, must depend upon its own facts, and no two will be found exactly alike. The trier of the facts must evaluate them in each case, and precedents are not greatly valuable. Plaintiff's case depends upon her disputed statement concerning the marriage agreement and a number of evidentiary items which tend to support her claim that there was a present agreement for marriage, followed by cohabitation.

It appears that during the period from her return to the farm in 1940 until the separation of the parties in late 1953 there was repeated sexual intercourse. This the defendant admits: They had separate rooms; but plaintiff says this was the same arrangement as before their divorce. The plaintiff performed many services around the farm not ordinarily within the duties of a housekeeper. They went on fishing trips to Minnesota with other couples, and at such times lived together as husband and wife. They stayed at various times on other trips in hotels in Omaha, Red Oak, Sidney, Des Moines, Pomeroy, and Estaline, South Dakota, and on these occasions occupied the same room. The defendant registered at the hotels, undoubtedly in a way which indicated to the hotel managements that they were husband and wife. On one occasion shown by the record he signed the hotel register "Chris Gammelgaard and Beulah Gammelgaard." At one time they stayed at the home of a cousin of defendant in Worthington, Minnesota, occupying the same room and bed.

When they left the farm in the spring of 1951, a surprise party was given for them in Ringsted and gifts were offered and accepted. The defendant made a short talk of acceptance and

thanks. The affair was reported in the Ringsted Dispatch as a farewell party honoring Mr. and Mrs. Chris Gammelgaard. While living on the farm they had guests in their home, who were mostly married couples, and attended dances and other social functions together as a married couple would be much more likely to do than a man and his housekeeper. On one occasion when on a Minnesota fishing trip they purchased a combination "husband and wife" fishing license. The plaintiff signed defendant's name on this occasion, but in his presence and without any protest and he paid for it. She wrote checks on a checking account which was in his name in a bank. Many exhibits showing Christmas cards and invitations addressed to Mr. and Mrs. Chris Gammelgaard were introduced into the record. Three persons living in the neighborhood testified they were generally reputed there to be husband and wife; and although on cross-examination each said that he, or she, was giving an individual impression, the fact these disinterested parties each thought they were married has some weight. (The defendant introduced one witness who said she did not think they were married; she knew nothing of general repute.)

When Chris left the farm, after the parties had lived there about eleven years, he took Beulah along and established a home in Ringsted. He paid all the bills there; and when he engaged in business in Britt he rented a house and again took her with him. When the lease expired, he told the plaintiff he could not find another house for rent and moved her back to the place he owned in Ringsted. He rented a room in Britt; but on week ends it was his custom to return to the Ringsted home and live with the plaintiff there. She charged the expense of the establishment to him, and he paid the bills. This continued until the serpent appeared in the garden in the form of another woman, or women, and the affair took a not unusual course from there.

The foregoing evidence, most of which is undisputed in the record, indicates the parties were cohabiting as a husband and wife ordinarily do. There are some facts appearing, however, which are relied on by the defendant as requiring a different conclusion. Some of these do not have the significance claimed for them; others, it must be admitted, are not altogether com-

patible with the plaintiff's claim of an existing marriage. In the latter category are the plaintiff's acceptance of other employment in 1940 before moving into the farm home with defendant in the fall of that year; an application she signed in 1942 when attempting to enlist in the Women's Army Corps in which she named her son Thomas as her next of kin; and the testimony of Thomas that he did not believe his parents were married. His statement is considerably weakened, however, by the fact that he did not seem to know of the repeated acts of intercourse or occupancy of the same bedroom many times, all of which defendant admits.

The defendant also stresses plaintiff's admission that at the time of the claimed marital agreement she did not know there was such a thing as a common-law marriage, and her requests to have a marriage ceremony performed. It was not necessary that plaintiff know the legal terminology of a common-law marriage. She says "I knew that people lived together and were considered man and wife and were man and wife." Nor is it unreasonable that she wished a ceremonial marriage. It would have been a formal recognition of the status they had already assumed. In re Estate of Wittick, supra, page 495 of 164 Iowa, page 917 of 145 N.W.

Defendant also thinks it important that the plaintiff was never asked to sign corn loan papers, on which the wife's signature is required, and that he did not list her as an exemption on his income tax returns. These, however, were matters solely within the control of the defendant, and there is no showing that plaintiff knew of them. It is also to be noted that defendant introduced only three income tax returns out of the twelve which he must have made during the time they cohabited. Here is a showing of an apparent attempt by the defendant to secure the advantages of the marital status without its responsibilities; another facet of which is the somewhat peculiar way he signed the hotel registers by writing the first names of the parties instead of the form of "Mr. and Mrs." or "Chris Gammelgaard and wife" which would ordinarily be used by married couples. Without doubt, he wished the hotel clerks to think they were married, while attempting to leave himself a means of escape from an outright admission. His attitude in these things is not calculated to

inspire confidence in his good faith throughout his dealing with the plaintiff.

Our attention is also called by the defendant to some letters written by Beulah in which she referred to her "job" and to the defendant as "the boss" or "her boss." She explains these by saying she referred to her work on the farm, and that it was customary in the family to call defendant "the boss." Also reliance is placed upon an article written by plaintiff in which she said "I made a big mistake, I went out there without getting married." Again it is plaintiff's version that she meant simply without a formal ceremony. Viewed from this point her statement was well founded, as this litigation proves.

The defendant also urges that it is significant neither the plaintiff nor defendant ever introduced the other as her husband or his wife; and that there is no sufficient showing of general repute in the community where the parties resided that they were wife and husband. Introduction or acknowledgment of the marital relation and reputation in the neighborhood are not in themselves proof of present agreement and intent, but they may support other evidence, and are often important in these cases.

But we think the defendant in making these contentions overlooks some material facts. We have pointed out that the parties on various occasions stayed at hotels, occupying the same room and bed. However the defendant may have tried to sign the register without flatly admitting the marital relationship, we know that hotelkeepers do not make a practice of permitting adults of opposite sexes to occupy the same room unless they believe them to be married. The fact of registration and occupancy in itself was a representation that they were husband and wife. The same is true of the overnight stay with defendant's cousin. We cannot conceive that it was not intended this relative should believe they were married, or that they were sleeping together in the cousin's home in a relation of concubinage. These were clearly representations of a married status.

As to general reputation, there is the record of social relations, including visits back and forth, trips to fishing resorts, and the farewell party in Ringsted, which are important. These indicate clearly that it was believed plaintiff and defendant were

wife and husband. It is not likely the other married persons in the community would have so associated with them socially if they had not thought their relation was honorable. The article in the Ringsted newspaper is also significant. It is some evidence of a general reputation. Objection was made to the introduction of the story of the party, but we think it admissible as bearing on the question of repute.

The total of the various contentions must be added and the weight determined. So far as they are in dispute we give weight to the findings of the able trial court, and are satisfied with them. As in most litigation, there is something to be said on each side. If there were no differing opinions, there would be no lawsuit; but we conclude plaintiff has successfully carried the burden of showing a present agreement for a common-law marriage and certainly cohabitation following it.

II. The trial court awarded plaintiff the homestead property in Ringsted, $1000 in cash, and judgment for $75 per month, in addition to an allowance of $500 for her attorney. The defendant urges there was no sufficient evidence of his financial condition at the time of the trial to warrant such an allowance, or any allowance. The time of the trial was apparently in September 1954. The evidence showed that immediately before defendant purchased the interest in the business in Britt he had $19,000 in a bank in Emmetsburg, about $17,000 to $18,000 in a bank in Ringsted, and $5000 in a third bank in Estaline, South Dakota. He invested $40,000 in the business, and he and his partner have bought the building in which it is operated for $18,000, of which they still owe $14,000. These figures relate to 1951, and the defendant contends there is no showing of his financial resources at the time of the trial which would permit the court to make any allowance against him. It did appear that he still had his interest in the business and the building. He thought conditions were not so good; "machinery is a rough business at the present time." They were "slipping back."

The plaintiff, a woman between fifty-five and sixty years of age, was not in good health and had no resources of her own or means of support, so far as the record shows. We think the evidence as to defendant's resources and financial standing was

definite enough to enable the trial court to make an award, and that its judgment in this respect was equitable.—Affirmed.

All JUSTICES concur.