HAZEL DITTMAN COLEMAN, appellee, v. JULIA GRAVES et al., appellants; O. B. OVERHOLT, as executor of estate of Charles W. Coleman, appellant.

No. 51008.

(Reported in 122 N.W.2d 853)

JULY 16, 1963.

Owen B. Overholt, of Glidden, and Edward S. White, of Carroll, for appellants.

Wunschel & Schechtman, of Carroll, for appellee.

MOORE, J.—Plaintiff commenced this partition action claiming an undivided one-third interest in personal and certain real property in Carroll County of which Charles W. Coleman died

seized on April 26, 1960. She alleged she was his widow by virtue of a common-law marriage. Defendants, his legatees, devisees, heirs-at-law and the executor of his estate, denied such marriage. The trial court held for plaintiff, confirmed in her a one-third interest in the personal and real property and ordered its partition. Defendants have appealed.

At the time of trial plaintiff was incompetent. Her guardian was substituted as plaintiff. Since the decree plaintiff has died. By agreement the executor of her estate has been substituted as plaintiff-appellee. However for clarity and brevity we refer to her as plaintiff.

The only real issue is whether plaintiff was the surviving spouse of Charles W. Coleman by virtue of a common-law marriage. It is primarily a question of fact.

I. On March 5, 1937, Hazel Dittman and her eight-year-old son, Earl, moved into the Carroll County farm home of Charles W. Coleman. He was a widower without children. She had obtained a divorce from Frank Dittman in 1931. He died December 13, 1946. She acted as housekeeper and did some farm work. The arrangement between the parties is not shown by the evidence. She bought groceries with money furnished by Coleman. In 1948 they moved from the farm to a house in Glidden. The farm operation was continued with hired help. On July 10, 1951, Hazel Dittman and Coleman executed a document designated "Settlement and Release Covering Claim for Wages and Services." By its terms he paid her $4300 in full settlement of all claims held by her of every nature including wages and services as his housekeeper from March 1937 to June 17, 1951. The document shows he contended the consideration for her services was her support. The document states:

"3. It is further understood that Hazel Dittman states and represents that a common-law marital relationship does not exist between the parties hereto and that her claim for wages and services is not based on any such relationship.

"4. The undersigned Hazel Dittman further states that the party of the second part did not at any time represent or state to anyone that they were husband and wife."

Plaintiff continued living in the Coleman home until April

1953 when she went to Oregon with her son. Coleman became lonesome and asked friends to write and ask her to return. She returned to Iowa in October 1953 and stopped at her daughter's home in Audubon County. Within an hour and a half Coleman appeared at the daughter's home. He asked plaintiff if she was ready to come back home. She said, "Yes". She returned with him to the home in Glidden and lived there until after his death April 26, 1960.

No direct evidence of a marriage agreement between plaintiff and Coleman is shown. The evidence of any such agreement is circumstantial. Apparently plaintiff contends such an agreement was made when she returned in 1953 or soon thereafter.

A review of the conduct of the parties is necessary. Soon after her return Coleman told his neighbor, Neal Whitten, he was paying Mrs. Dittman wages and social security and he was not going to get taken twice for the same thing. His checks of $12 each per week for several weeks just before his death are exhibits. They are payable to Hazel Dittman and so endorsed. He paid the United States Treasury Department employers' quarterly tax for household employees for the four quarters of 1959. During the period from June 11, 1954, to July 1955, Coleman executed three deeds to farmland in Carroll County, another to land in Greene County and one for lots in Glidden. In each he is listed as a widower or unmarried. The deeds are so acknowledged. His income tax returns for the years 1954 to 1959 all list him as single and claim only the standard exemptions for himself. April 30, 1957, Coleman signed a request for enrollment in the Jefferson Benevolent Society in which it is stated he is single and his spouse is deceased. He designated his estate as beneficiary. In his will dated September 7, 1955, Mr. Coleman referred to Hazel Dittman as his housekeeper and devised her a life estate in his home in Glidden together with his automobile and household furnishings conditioned upon her being in his employ at his death and upon her personally occupying and using this property.

Coleman's weekly $12 checks dated in March and April 1960 were endorsed by Hazel Dittman and cashed at the Glidden bank, the grocery store or her doctor. She was a patient of Dr.

James M. Tierney from 1954 until 1961. During all this time she stated her name to be Mrs. Hazel Dittman. Her medical records all so list her. She was a patient of Dr. R. B. Morrison on June 16, 1954. She told him her name was Hazel Dittman and she was single and a widow. February 25, 1957, she was signed into St. Anthony's Hospital at Carroll by her son Charles M. Dittman as "Dittman, Mrs. Hazel/Frank C." Charles is listed as relative. She remained there until March 10, 1957. She again entered this hospital June 6, 1959, and was signed in under the same name by C. W. Coleman. The entrance sheet signed by Coleman lists her occupation as "Housekeeper for Chas. W. Coleman." Her daughter is listed as relative. She stayed until June 12, 1959. She again became a patient at the same hospital June 18, 1959, under the same name. The entrance sheet and another hospital record are both signed by Hazel Dittman herself. Each lists her daughter as relative and states her occupation as "housekeeper for Chas. Coleman". She was released June 30, 1959. She again entered this hospital under the same name on October 12, 1961, and remained there until January 1, 1962. In June 1959 she told a nun at the hospital Mr. Coleman was not her husband and she was his housekeeper.

October 25, 1955, she signed a request for enrollment in the Jefferson Benevolent Society. It states her spouse is deceased. Her occupation is listed as housewife and her son and daughter-in-law are made beneficiaries. It is signed "Hazel F. Dittman". June 7, 1957, she wrote asking the names of the beneficiaries be changed to her daughter and another son. She signed, "Mrs. Hazel F. Dittman, Box 404, Glidden, Ia." The day Mr. Coleman died she wrote the Benevolent society:

"Glidden, Ia. April 26, 1960.

"Dear Sir: C. W. Coleman of Glidden, Iowa passed away at 2:30 p.m. this morning April 26, 1960 at St. Joseph's Hospital in Omaha, Nebraska.

"Yours truly,
"Mrs. Hazel Dittman, Glidden, Iowa."

In May 1957 plaintiff applied for general relief in Carroll County under the name Mrs. Hazel Dittman. She informed the

social worker she was working for Charles Coleman in Glidden and had acted as his housekeeper since 1936. She stated at that time he was giving her spending money and, of course, her board and room. Later as part of the investigation the worker talked with Mr. Coleman. He remarked Mrs. Dittman should be paying him for keeping her. After investigation, general and medical relief was furnished her.

After Mr. Coleman's funeral, a card of thanks was published in the Glidden Graphic in which "Mrs. Hazel Dittman and family" joined with his relatives in expressing appreciation for floral offerings, and other kindnesses. In the same issue is an announcement Hazel Dittman would succeed the late C. W. Coleman as representative of Black's Hybrids. On May 12, 1960, she signed "Hazel Dittman" on a corn account signature card at the Glidden bank.

The evidence of her relatives, his cousin and a hired man clearly establishes plaintiff and Coleman for many years prior to his death occupied the same bedroom, kept their clothing and toiletries together and she regularly helped him take his bath. Cohabitation as early as 1950 or 1951 is well established by the evidence.

Earl Dittman says in 1955 he heard his mother and Coleman talking about getting married and his mother said, " 'Why go to the preacher' ". He says he later asked her if they ever got married by a preacher and she answered in the negative and said they were happy the way they were. Earl says Coleman told him he was going to pay social security for his mother so she would be able to draw it and would not have to prove her marriage.

The evidence is in sharp dispute as to whether Coleman held her out as his wife. Several witnesses say he called her "Ma", "Mom" and "Old Lady" at times and on a few occasions referred to her as his wife. Others say no such references were made by him but that he referred to her as Hazel or his housekeeper. The Presbyterian minister at Glidden frequently visited Mr. Coleman during the last two years of his life and says he referred to her as Mrs. Dittman and his housekeeper and he never indicated she was anything else.

Some witnesses say Mr. Coleman referred to the property as "ours" and not "my" property and on occasions referred to her children as "my sons" and their wives as "my daughters-in-law". Also that he sometimes referred to her grandchildren as "our grandchildren".

No claim of any holding out by her is indicated. Apparently she wore no ring. No registration or mutual signing of papers is shown. Nor is there any evidence of an announcement of any marriage by either or both of them. She never assumed his name.

Evidence of their reputation in Glidden and Carroll County is in conflict as to whether it was that of husband and wife or employer and housekeeper. Some witnesses, mostly her relatives, say they were known in the community as husband and wife. Many witnesses, including his relatives, a banker, grocer, feed salesman and the minister say she was known in Glidden as his housekeeper.

■■■■ II. The applicable principles of law are well established and there is no real dispute between the parties concerning them. Our review is de novo. Rule 334, Rules of Civil Procedure. Common-law marriages are recognized as valid in Iowa. Pegg v. Pegg, 138 Iowa 572, 115 N.W. 1027; In re Estate of Wittick, 164 Iowa 485, 145 N.W. 913; Love v. Love, 185 Iowa 930, 171 N.W. 257; In re Estate of Stopps, 244 Iowa 931, 57 N.W.2d 221; Gammelgaard v. Gammelgaard, 247 Iowa 979, 77 N.W.2d 479; In re Estate of Long, 251 Iowa 1042, 102 N.W.2d 76. A common-law marriage may be proven by circumstantial evidence. In re Estate of Allen, 251 Iowa 177, 182, 100 N.W.2d 10, 12; 35 Am. Jur., Marriage, section 207, page 316; 55 C. J. S., Marriage, section 45, page 902. Mere proof of cohabitation is not sufficient. In re Estate of Medford, 197 Iowa 76, 78, 196 N.W. 728; Gammelgaard v. Gammelgaard, supra (loc. cit. page 980).

In our recent case, In re Estate of Long, supra, 251 Iowa 1042, 1046, 1047, 102 N.W.2d 76, 79, we say:

■■ "From consideration of the many Iowa decisions, and of the principles stated in decisions in many other states, we are outlining the elements and conditions necessary to establish the

existence of a common-law marriage: 1. Intent and agreement in præsenti, as to marriage, on the part of both parties, together with continuous cohabitation and public declaration that they are husband and wife. 2. The burden of proof is on the one asserting the claim. 3. All elements of relationship as to marriage must be shown to exist. 4. A claim of such marriage is regarded with suspicion, and will be closely scrutinized. 5. When one party is dead, the essential elements must be shown by clear, consistent and convincing evidence."

III. The evidence before us has been carefully abstracted. It occupies 111 pages of the record. Thirty-eight exhibits have been certified to us. We have undertaken only to outline most of the important features. A more complete detail would unduly lengthen the opinion and serve no useful purpose.

As in most litigation, much is said on each side. We have considered and weighed the parties' various contentions. We conclude plaintiff's burden to establish a common-law marriage by clear, consistent and convincing evidence is not met.—Reversed.

All JUSTICES concur.