**IN THE COURT OF APPEALS OF IOWA**

No. 16-0997
Filed November 8, 2017

**IN RE THE MARRIAGE OF MARSHA KAY HILLER
AND STEVEN MARK NELSEN**

**Upon the Petition of
MARSHA KAY HILLER,**
      Petitioner-Appellee/Cross-Appellant,

**And Concerning
STEVEN MARK NELSEN,**
      Respondent-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Greene County, Steven J. Oeth, Judge.

Steven Nelsen appeals a dissolution decree concluding he entered a common law marriage with Marsha Hiller and challenges the alimony award; Marsha cross-appeals the decree's economic provisions. **AFFIRMED AS MODIFIED AND REMANDED.**

Alexander E. Wonio of Hansen, McClintock & Riley, Des Moines, for appellant.

Vicki R. Copeland of Wilcox, Gerken, Schwarzkopf, Copeland & Williams, P.C., Jefferson, for appellee.

Heard by Vogel, P.J., and Tabor and Bower, JJ.

**TABOR, Judge.**

The threshold question in this appeal is whether Marsha Hiller and Steven Nelsen entered into a common law marriage. Seeking a dissolution of marriage, Marsha had the burden to show the couple agreed and had the present intent to be married, publicly declared that intent, and continuously cohabitated. Because Marsha satisfied her burden, we affirm the existence of a common law marriage. But because we conclude the marriage started in 1993, instead of 1998, we modify the decree. We remand for the district court to enter qualified domestic relations orders (QDROs) using the earlier marriage date. We also modify the duration of the alimony award; Steven shall pay traditional alimony of $1200 per month until either party dies or Marsha remarries. We further modify the decree to provide Steven shall pay Marsha $16,000 to equalize the division of the couple's property. Finally, we grant Marsha's request for appellate attorney fees.

I.      **Background Facts and Prior Proceedings**

Steven and Marsha attended high school together in Dennison, Iowa. They started living together in Arizona in 1988 when their son J.N. was a baby. They continued to cohabitate thereafter, expanding their family in 1993 with son C.N. and in 1996 with son Z.N.. Marsha consulted with a dissolution attorney in April 2015, a month before the youngest child graduated from high school. Contending the parties had a common law marriage, Marsha petitioned for dissolution on July 21, 2015. The next month, she moved to Minnesota to live with her mother. Steven remained in the family home in Jefferson, Iowa.

The district court held a trial on March 23 and April 19, 2016. The court found a common law marriage commenced on July 1, 1998.[1] The court divided the parties' assets and debts and ordered Steven to pay $1200 monthly alimony for twelve years.[2] On appeal, Steven maintains no common law marriage existed. In the event we affirm the existence of a common law marriage, he then challenges the alimony award.[3] On Marsha's cross-appeal, she defends the marriage and raises economic issues.

## II.  Scope and Standard of Review

We review de novo Marsha's claim of a common law marriage. *See In re Marriage of Martin*, 681 N.W.2d 612, 646 (Iowa 2004). We examine the entire record and adjudicate anew the parties' rights on the issues properly presented. *See In re Marriage of Williams*, 589 N .W.2d 759, 761 (Iowa Ct. App. 1998). When we consider the credibility of witnesses, we give weight to the findings of the district court but are not bound by them. *See In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013).

---

[1] In a motion to amend and enlarge, Steven asked the court to "set off to him the share of the military retirement and IPERS retirement that accrued prior to July 1, 1998." Steven reasoned that splitting the year 1998 was fair to both parties. The court granted his request.

[2] The court also ordered Steven to pay a portion of Marsha's trial attorney fees. On appeal, Steven does not challenge the attorney-fee award.

[3] The third and final issue in Steven's appellate brief challenges the court's distribution of assets and debts. But Steven does not develop the argument or provide us with citations to the record supporting his conclusory claims. We will not assume a partisan role and undertake a party's research and advocacy. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("In a case of this complexity, we will not . . . comb the record for facts to support such arguments."). Accordingly, we decline to address his claim concerning the court's property division.

### III.     Common Law Marriage

Iowa recognizes both ceremonial marriages, which are governed by statute, and common law marriages.  *Martin*, 681 N.W.2d at 616-17 (stating common law marriage "has been recognized in Iowa for well over a century"). The burden rests on the party claiming the existence of a common law marriage, here Marsha, to prove the union by a preponderance of the evidence.[4]  *See In re Marriage of Grother*, 242 N.W.2d 1, 1 (Iowa 1976).  Marsha's claim "is regarded with suspicion and is closely scrutinized."  *Id.*; *see also In re Marriage of Winegard* (*Winegard II*), 278 N.W.2d 505, 510 (Iowa 1979) (observing there is "no public policy in Iowa favoring common law marriage"); *Fisher*, 176 N.W.2d at 804 ("There is no presumption that persons are married.").  Each case depends upon its own unique facts; "precedents are not greatly valuable."  *Gammelgaard v. Gammelgaard*, 77 N.W.2d 479, 481 (Iowa 1956).

To establish a common law marriage, Marsha had the burden to prove the following: (1) a present intent and agreement by both parties to be married, (2) a public declaration they are wife and husband, *and* (3) continuous cohabitation. *Winegard II*, 278 N.W.2d at 510.  If Marsha meets her burden, the parties' common law marriage can only be ended by a decree of dissolution.  *See In re Estate of Stodola*, 519 N.W.2d 97, 100 (Iowa Ct. App. 1994) (stating once a couple is married by common law then a dissolution decree is necessary to dissolve the marriage).

---

[4] "When one party is deceased, the party asserting the marriage must prove the elements of a common law marriage by a preponderance of clear, consistent, and convincing evidence."  *Conklin by Johnston-Conklin v. MacMillian Oil Co.*, 557 N.W.2d 102, 105 (Iowa Ct. App. 1996); *see also In re Estate of Fisher*, 176 N.W.2d 801, 805 (Iowa 1970) (same).

*Present Intent and Agreement.* "The requirement of a present intent and agreement to be married reflects the contractual nature of marriage." *Martin*, 681 N.W.2d at 617. The agreement can be either express or implied. *Id.* An implied agreement may support this element where one person intends to be married and the would-be spouse does not share in that intent, but the would-be spouse's conduct "reflects the same intent." *Id.* This requirement "precludes a common law marriage based on an intent to be married at some future time." *Id.*

*Public Declaration.* Common law marriages cannot be secret. *In re Marriage of Winegard* (*Winegard I*), 257 N.W.2d 609, 616 (Iowa 1977). A couple's "holding out" of marriage to others is the "acid test" of a common law marriage. *Martin*, 681 N.W.2d at 618; *Winegard I*, 257 N.W.2d at 616. This element does not require all the parties' public declarations to be entirely consistent with marriage. *Martin*, 681 N.W.2d 618. Rather, a "substantial holding out to the public in general is sufficient." *Id.* (citing *Stodola*, 519 N.W.2d at 100 (finding a common law marriage based on a notarized affidavit even though the parties represented they were single and not married at other times)).

*Continuous Cohabitation.* Cohabitation is generally defined as "living together, [especially] as partners in life, [usually] with the suggestion of sexual relations." *Cohabitation*, *Black's Law Dictionary* (10th ed. 2014). This element is circumstantial evidence of the existence of a common law marriage but cannot alone establish a common law marriage. *Conklin*, 557 N.W.2d at 105. The parties' cohabitation must "be tied to their present intent and agreement to be married." *Martin*, 681 N.W.2d at 618.

*Analysis.* A timeline of this couple's relationship is helpful in determining if and when they entered into a common law marriage. In December 1988—shortly after Marsha and their first son joined Steven in Arizona—the parties executed an affidavit declaring they had a common law marriage, even though Arizona did not recognize such marriages.[5] Three years later, in 1991, Marsha gave Steven a "wedding" ring. He returned the favor, presenting her with an engagement ring for Christmas in 1992, when Marsha was pregnant with their second child. Marsha testified she was excited and "had the bridal magazines and was making my list." These actions signal no common law marriage existed while the couple lived in Arizona because the parties had the intent to be married in the future in a formal ceremony. *See id.* at 617.

After the second child was born in 1993, Steven and Marsha moved to Jefferson, Iowa. Marsha testified financial constraints caused them to abandon the idea of a ceremonial marriage—"we had two small children [and] [o]ur money went towards our children, our household expenses." After the move, Steven accepted a job with the city of Fort Dodge in late November 1993. When he started work, he filled out two handwritten applications, one for term life insurance and one for health insurance, indicating to his employer that Marsha was his "spouse." The city's May 1994 memo, entitled "Addition of Common Law Wife to Policy," demonstrates Steven shared Marsha's belief the parties had entered into a common law marriage in Iowa, as of November 24, 1993:

---

[5] Steven was a member of the National Guard from 1986 through 2008. He covered Marsha on his automobile insurance through his military service until Marsha filed for dissolution in 2015.

> Steve Nelsen . . . is an employee of the City of Fort Dodge and became eligible for that group policy December 1, 1993. Mr. Nelsen, *at the time of signing up*, asked about coverage for his common law wife. He was told at that time that she would be eligible for coverage; however, would have to complete an "Affidavit for Common Law Marriages" to attach to the application
>
> Because of some miscommunication, his "wife" never was added to the policy. Enclosed please find the [January 26, 1994] common law marriage affidavit along with a completed application listing Marsha Hiller as his spouse. We need to go back and correct records to show Marsha was covered when the original policy went into effect—December 1, 1993.

(Emphasis added.) *See Gammelgaard*, 77 N.W.2d at 481 (explaining parties' cohabitation, as well as conduct and general community reputation, can strengthen proof of present intent and agreement to be married).

In addition to Steven's 1993 representations to his employer that Marsha was his common law wife, in 1994 he voluntarily changed his IPERS beneficiary to "Marsha K. Hiller, Wife." Steven left this designation unchanged when he started a new job in 1995 with the Iowa Department of Transportation. Steven did not have IPERS remove his "wife" as his beneficiary until 2015, when Marsha left the family home. Likewise Steven informed his current employer, Alliant Energy, that Marsha was his spouse over numerous years and for varied reasons—health insurance, dental insurance, life insurance, and designated pension beneficiary. In 2015, Steven changed Marsha from his spouse to his "domestic partner" on Alliant forms.[6]

Steven represented to multiple employers that Marsha was his wife by common law—beginning on November 24, 1993, and continuing until Marsha

---

[6] In 2016, Steven denied Marsha was his domestic partner.

moved out in 2015. Accordingly, we believe the record satisfies the present intent and public declaration elements of common law marriage.

We find additional support for the parties' common law marriage in the fact Steven consistently filed the parties' tax returns as married from 1998[7] forward—both when he prepared the filings himself and when he hired tax preparers.[8] As the district court recognized, on occasion "the parties filed real estate documents indicating they were single or did not indicate a marital status," but in other real estate documents the parties stated they were married. In light of Steven's consistent representations of marriage to his employers and the parties' long cohabitation, we, like the district court, conclude the real estate "inconsistencies do not negate a finding of a common law marriage." *See Martin*, 681 N.W.2d 618. Our conclusion is undergirded by the fact Steven wrote to his "wife" Marsha at least two times. Specifically, he sent Marsha a love letter and "reminisced" about her being his wife "for sixteen years." On another occasion, Steven gave Marsha a "wedding anniversary" card. Such actions would lead Marsha to reasonably believe Steven viewed them as a married couple, just as she did. Finally, we credit the district court's observations of the witnesses and its finding: "[A]fter weighing the oral testimony presented on both sides of the issue, [the court concludes] there was a substantial holding out that the parties were

---

[7] The district court found, although there were a few inconsistencies thereafter, the parties' common law marriage commenced sometime in 1998.

[8] One accountant testified he "quite often" saw "married individuals with different last names." Therefore, when Steven met with him about the parties' 2013 tax return, the accountant asked Steven "point blank" whether "married" was the correct status. Steven responded, "Yes." We likewise recognize different last names is not an unusual occurrence. Therefore, documents bearing a party's name without a categorizing word such as "spouse" or "single" do not aid our resolution. We give no weight to the fact Marsha's name was listed separately in the telephone book or church directory.

married." *See In re Marriage of Gensley*, 777 N.W.2d 705, 713 (Iowa Ct. App. 2009) (discussing deference to district court's credibility determinations).

Concerning the cohabitation element, the parties lived together while raising their three children from 1988 until August 2015—a total of twenty-seven years.[9] Friends of the children who spent time in the family home testified to their belief Steven and Marsha were married, and the district court credited that testimony. We defer to the trial judge's credibility calls because he had the opportunity to observe the witnesses in person before reaching his evaluation of their truthfulness. *See id.* We conclude Marsha satisfied the cohabitation element.[10]

In sum, Marsha proved by a preponderance of the evidence the parties had a common law marriage as of November 24, 1993. We modify the decree to show this date as the start of their common law marriage. On remand, QDROs consistent with this modification shall be entered.[11]

---

[9] After the parties returned to Iowa, Marsha took their children and left for a few days when Steven accepted a job in Fort Dodge, instead of continuing to look for a job in Minnesota, where Marsha wanted the family to live. This brief rift was their only separation.

[10] On appeal, Steven contends the couple lost intimacy over the course of their relationship, ceased sexual relations in 2004, and slept in separate bedrooms since 2006. The district court did not discuss or credit this testimony. Even if Steven's allegations are true and somehow relevant, by the time the parties' intimacy declined, they had already established a common law marriage, and such marriage could only be ended by a decree of dissolution. *See Stodola*, 519 N.W.2d at 100.

[11] Generally, a property division involving retirement benefits evolves in two steps. *In re Marriage of Heath-Clark*, No. 15-0525, 2016 WL 2753779, at *3 (Iowa Ct. App. May 11, 2016). First, the district court enters a dissolution decree, which is a substantive order equitably dividing and assigning the parties' property. *Id.* (citing *In re Marriage of Brown*, 776 N.W.2d 644, 647-48 (Iowa 2009)) (discussing finality of decrees, property division, and QDROs). Second, to implement the court's division of retirement benefits, a QDRO is entered that directs the plan administrator to make specified payments to the non-employee ex-spouse. *Id.* Thus, "a QDRO is characterized properly as a procedural device required by federal law and entered to effectuate the property division made in the dissolution decree." *Id.*

## IV. Alimony

Having found a common law marriage, we turn to the question of alimony. Alimony, or more formally spousal support, "is a stipend to a spouse in lieu of the other spouse's legal obligation for support." *See In re Marriage of Tzortzoudakis*, 507 N.W.2d 183, 186 (Iowa Ct. App. 1993). When determining spousal support we consider the factors in Iowa Code section 598.21A(1) (2016).[12] While not characterizing its alimony award as traditional, rehabilitative, or reimbursement, the district court ordered Steven to pay $1200 monthly alimony for twelve years. Both parties challenge the alimony award on appeal.

Steven argues alimony is "simply not necessary" because Marsha has an earning capacity of $40,000 per year. Marsha clarifies that she could only earn that amount if she had part-time jobs on top of her full-time employment at Fastenal, the company where she has worked for more than ten years. She presented evidence that her current annual income is $30,000.

At trial, Marsha asked for $1880 per month in traditional alimony. She noted Steven's education; the fact she moved with him to advance his career; their standard of living, including family vacations to Disney World; and Steven's ability to pay. Significant to our analysis here, Steven is fifty years old; his

---

[12] The factors include: the length of the marriage; the age and physical and emotional health of the parties; the distribution of property; the educational level of each party at the time of marriage and at the time the action is commenced; the earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment; the feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal; the tax consequences to each party. Iowa Code § 598.21A(a)-(g).

doctors have recommended lap band surgery to address his weight problem. He earned associate degrees from community colleges in Arizona. Forty-seven-year-old Marsha is in good health. Both parties are hard workers and have maintained steady employment. Marsha was able to transfer her full-time employment with Fastenal when she moved to Minnesota.

The district court found the fact Steven has more education than Marsha "is reflected in the respective jobs held by the parties. Steven is a drafter for Alliant and earns $92,655 per year." In contrast, "Marsha is a sales representative and earns $29,296 per year." The court then determined both parties had inflated their monthly expenses and "are leaving the marriage with the same amount of assets."[13]

We agree with the district court's determination of the annual earnings of each party. Although Marsha is healthy, her earning capacity remains lower than Steven's. Accordingly, we find the amount of the monthly alimony to be equitable. Moreover, based on our finding of a November 24, 1993 marriage date, Steven and Marsha were married for more than twenty years.[14] *See In re Marriage of Gust*, 858 N.W.2d 402, 411 (Iowa 2015) ("In marriages of long duration, the historical record ordinarily provides an objective starting point for determining earning capacity of persons with work experience."). We next turn to Marsha's challenge to the court's twelve-year duration of the alimony award.

---

[13] The decree does not include a spreadsheet either assigning a value to the parties' assets and debts or arriving at a total distribution for each party.
[14] Based on its finding the marriage commenced in 1998, the district court logically concluded the marriage, while not short term, was not a twenty-year marriage.

"Traditional spousal support is often used in long-term marriages where life patterns have been largely set and the earning potential of both spouses can be predicted with some reliability." *Id.* at 410 (citation omitted) (stating marriages over twenty years "merit serious consideration for traditional spousal support"). The purpose of a traditional "alimony award is to provide the receiving spouse with support comparable to what he or she would receive if the marriage continued." *Id.* at 408 (citation omitted). Here, the parties' earning disparity weighs in favor of traditional alimony. Accordingly, we extend the alimony award; Steven shall pay traditional alimony of $1200 per month until either party dies or Marsha remarries. *See id.* ("Traditional support is ordinarily of unlimited or indefinite duration.").

## V.  Division of Property

When a couple divorces, Iowa law requires an equitable division of marital property. *See* Iowa Code § 598.21(5). This court makes an equitable award under the circumstances. *See In re Marriage of Hoak*, 364 N.W.2d 185, 194 (Iowa 1985).

Marsha contends the district court erred in identifying marital debt, raising several distinct challenges. We find merit to her challenges in an amount totaling $32,000; specifically, Steven's alleged "future debts" for "possible" lap band surgery ($10,000), "pending" car repairs ($4000), future 2014 tax payment ($9000), and future 2015 tax payment ($9000).[15] *See, e.g.*, *In re Marriage of Muehlhaupt*, 439 N.W.2d 656, 661 (Iowa 1989) ("It is the net worth of the parties

---

[15] At the time of trial, Steven had not filed his tax returns for those years. We also note Steven had money withdrawn from his paychecks to pay both state and federal taxes.

at the time of trial [that] is relevant in adjusting their property rights."). Because we remove $32,000 in debt from Steven's net worth, we modify the decree to order Steven to pay Marsha $16,000 to equalize the division of the parties' property. *See id.*

### VI.    Appellate Attorney Fees

Marsha requests appellate attorney fees. An award of attorney fees is not a matter of right but rests in our discretion. *See McDermott*, 827 N.W.2d at 687. In exercising our discretion, "we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *Id.* (citation omitted). Marsha was partially successful on appeal, and her annual earnings are significantly less than Steven's. Considering these factors, we award Marsha $5000 in appellate attorney fees and order Steven to pay the court costs.

**AFFIRMED AS MODIFIED AND REMANDED.**