In re the MARRIAGE OF John Robert WINEGARD and Sally Ann Winegard.

Upon the Petition of Sally Ann WINE-GARD, Appellee, and concerning John Robert WINEGARD, Appellant.

No. 58528.

Supreme Court of Iowa.

Sept. 21, 1977.

Rehearing Denied Oct. 14, 1977.

Edward W. Dailey Law Offices, Burlington, for appellant.

Larsen, Schalk & Bradfield, Davenport, for appellee.

Heard before MOORE, C. J., and MASON, LeGRAND, REES and UHLENHOPP, JJ.

MASON, Justice.

This appeal was precipitated by an award of temporary attorney fees in protracted and complex dissolution of marriage proceedings in the district court for Des Moines County. Petitioner, Sally Ann Winegard, sought dissolution of her alleged common law marriage to respondent, John Robert Winegard. Respondent denied the existence of said relationship. The district court, pursuant to agreement of counsel, entered an order directing the dissolution action be litigated in bifurcated proceedings with the question of the existence of the marriage to be resolved first. Following a four-day evidentiary hearing, the court concluded a common law marriage relationship had been established. Relying upon that

determination, petitioner filed an application for temporary attorney fees. By order dated June 23, 1975, petitioner was awarded temporary attorney fees in the amount of $7,500. Respondent's notice of appeal therefrom was filed July 18.

The following lengthy factual recitation is required in light of the factual character of the issues presented for review herein. Respondent's failure to include in his brief a statement of the relevant facts, as required by rule 344(a)(3), Rules of Civil Procedure (now rule 14(a)(4), Rules of Appellate Procedure), and petitioner's extremely abbreviated factual presentation have made this task much more difficult and have necessitated an extraordinarily detailed examination of the voluminous record made below.

John and Sally, 53 and 30 years of age respectively at time of trial, first met in 1962, shortly after Sally commenced working in the office of John's Burlington business enterprise, Winegard Company. At the time, Sally was single and John was married and the father of two children. At some time in 1964 or 1965 John's first marriage was dissolved. In May of 1963 John and Sally commenced an erratic relationship which ultimately led to the present controversy.

Five months after John and Sally started seeing one another Sally married one Lonnie Anderkin and moved to Ohio. This union produced a child, Wendy Lynn, who was born in September of 1964. This marriage was apparently subjected to more than its share of marital and financial difficulties. At one point, Sally and Anderkin received a $500 loan from John. Subsequently, Sally returned to Burlington and asked John for financial assistance in order to obtain a dissolution of her marriage to Anderkin. Apparently, John gave her $50 on two different occasions which she used to commence two abortive dissolution actions in Iowa. During this period, which apparently was late 1965 and early 1966, John and Sally dated each other and traveled together.

In October of 1966 John accompanied Sally and her daughter to Las Vegas, Nevada, where Sally intended to commence divorce proceedings against Anderkin. Sally's legal and living expenses were paid by John. On December 7 Sally was granted a divorce from Anderkin, who appeared in the proceedings through counsel. During the six-week interval prior to the divorce decree, John divided his time between Las Vegas and Burlington. On the day the decree was issued, John and Sally returned to Burlington and at some point during the trip marriage was proposed by John and declined by Sally.

Upon their return to the Burlington area, John and Sally dated intermittently until February 1967 when Sally returned to Ohio and began living with her ex-husband Anderkin. A few months later, Anderkin went into military service and Sally moved in with his parents. The record is unclear with respect to Sally's activities in the following 15–18 months, but it is clear she married one Frank Gilvin in Dayton, Ohio, on October 31, 1968.

Sally's second marriage was apparently as troubled as her first and she once again returned to the Burlington area with John's financial assistance. Subsequently, John again accompanied her to Las Vegas, paying all expenses involved, and Sally was granted a default divorce from Gilvin on September 3, 1969.

Evidently, upon the divorce from Gilvin, Sally and John returned to Burlington where their relationship became matrimonially inclined. On April 4, 1970, John and Sally entered into an antenuptial agreement whereby, in essence, Sally waived " * * * all statutory or common law rights that she may have as the wife of John during John's lifetime and/or as the surviving spouse in the property or estate of John, * * *." In exchange for said waiver, John agreed to secure insurance on his life in the face amount of $100,000 and to name Sally as primary beneficiary thereof. The agreement stated its execution was prompted by the fact John and Sally " * * are contemplating marriage and may be married in the near future, * * *." (Respondent's exhibit # 3).

Shortly after the execution of said agreement, John and Sally traveled to Hawaii with the intention of being married there. However, upon their arrival in Hawaii, John told Sally he wanted to delay their marriage plans, explaining he had waited until the day before their departure to tell his daughter of their matrimonial intentions and he felt she needed more time to adjust to the situation. John and Sally returned to Burlington unmarried.

In September of 1970, just a few months after her trip to Hawaii with John, Sally returned to Ohio and renewed her living arrangement with her ex-husband Anderkin. Again, Sally's revived relationship with her former husband only lasted for 3–4 months and she returned to the Burlington area in December of that year.

Following Sally's return, her relationship with John was rekindled and on February 14, 1971, he gave her an engagement ring. On March 29 John and Sally reaffirmed the previously executed antenuptial agreement and left for Las Vegas again with the intention to be married upon their arrival in that city. Once again, however, John and Sally returned to Burlington a few days later without having participated in a marriage ceremony. Apparently, abandonment of their plans was at John's request.

Sally testified at trial that on their return flight John asked if she still wanted to get married and she responded she did. At this point, John placed a wedding band on Sally's finger. Confused about his actions, Sally asked John if they were going to be married upon their return to Iowa. John allegedly responded a marriage ceremony was unnecessary in Iowa and asserted they were "just as much married as anybody else there." Sally expressed concern over what to tell others with respect to their marital status and was directed by John to say they had been married in Las Vegas. In addition, John told Sally she could use his name.

In his version of the events which transpired during their Las Vegas journey, John admitted he intended to be married in that city, but maintained he changed his mind shortly after arriving there. John testified he informed Sally of his decision in their hotel room and there gave her the wedding band. He denied any symbolic significance in the gift of the ring, explaining he was only motivated by the fact he no longer had use for it. In response to Sally's expressed fear of potential embarrassment, John testified he told Sally she could move into his home temporarily and could use his name. He denied telling Sally they were "as much married as anybody else in Iowa," stated he recalled no in-flight conversation concerning their relationship and asserted he clearly told Sally he did not wish to marry her.

Immediately upon her return from Nevada, Sally and her daughter began living with John in his Burlington home. Various individuals were informed by Sally that she and John had in fact been married. John did nothing to deny or dispute his alleged marital relationship with Sally. The couple received wedding gifts from a number of people, including John's mother and brother and John's attorney. John and Sally received mail addressed to and traveled together as Mr. and Mrs. John Winegard. They attended family gatherings and sent out Christmas cards with "John and Sally Winegard" engraved thereon. Sally's picture appeared in the local newspaper and she was referred to therein as Mrs. John Winegard. In addition, Sally was given or had access to numerous credit cards, some of which listed the owner thereof as Mrs. John Winegard.

John and Sally's home life was apparently fairly stable until December 1971, eight months after their Las Vegas trip. At that time, Sally testified she felt John was involved with another woman and confronted him with her suspicions. John confirmed her belief and from that point on the parties' relationship deteriorated. February 6, 1973, Sally's petition for dissolution of marriage was filed.

Following the lengthy evidentiary hearing previously referred to, the district court held John and Sally were husband and wife by virtue of a common law marital relationship. John then unsuccessfully sought leave of this court to bring an interlocutory

appeal challenging the trial court's finding a common law marriage in fact existed. Following Sally's application for temporary attorney fees John initiated an unsuccessful federal court action challenging the constitutionality of various Iowa rules of discovery. Upon the resolution of the federal court skirmish, and a related unsuccessful petition for writ of certiorari in this court, and after an evidentiary hearing on Sally's application, the district court order allowing $7,500 for temporary attorney fees to Sally was entered. John's appeal herein challenges that order and additional trial court determinations which serve as the basis therefor.

This appeal presents the following issues for this court's consideration:

1. Is an order allowing temporary attorney fees in a dissolution action a "final judgment" within the meaning of rule 331(a), R.C.P., and thus appealable as a matter of right?

2. In bifurcated dissolution proceedings wherein the initial inquiry concerns the existence of the marriage itself, is the trial court's determination as to the existence of a marital relationship reviewable upon an appeal from the court's subsequent order allowing temporary attorney fees to one of the litigants?

3. Does the record herein sufficiently establish the existence of a common law marital relationship to justify an allowance of temporary attorney fees?

I. The scope of review applicable herein is dictated by several well-established principles. An action for dissolution of marriage is an equitable proceeding and, consequently, this court's review is de novo. Section 598.3, The Code; Rule 334, R.C.P.; *In re Marriage of Woodward,* 229 N.W.2d 274, 276 (Iowa 1975). In equity matters, such as this, where our review is de novo, rule 334, R.C.P., it is our responsibility to review the facts as well as the law and determine from the credible evidence rights anew on those propositions properly presented, provided issue has been raised and error, if any, preserved in the trial proceedings. While weight will be given to findings of the trial court, this court will not abdicate its function as triers de novo on appeal. *In re Marriage of Jennerjohn,* 203 N.W.2d 237, 240 (Iowa 1972); *In re Marriage of Morgan,* 218 N.W.2d 552, 556 (Iowa 1974); *Local Bd. of Health, Boone County v. Wood,* 243 N.W.2d 862, 864 (Iowa 1975).

II. A preliminary jurisdictional problem concerning the appealability of an order allowing temporary attorney fees in a dissolution action must first be resolved.

Whether such an order may be challenged through an appeal as a matter of right has never been decided by this court. The principles applicable to a resolution of this question are set forth as follows in *Mid-Continent Refrigerator Co. v. Harris,* 248 N.W.2d 145, 146 (Iowa 1976):

"I. Although neither party hereto questions our jurisdiction in this case, we will sua sponte dismiss an appeal neither authorized nor permitted. * * * [citing authorities].

"II. At this point Iowa R.Civ.P. 331(a) comes into play. It says, in substance, appeal may be taken as a matter of right from any final adjudication.

"As repeatedly articulated by this court, a final judgment or decision is one that finally adjudicates the rights of the parties. It must put it beyond the power of the court which made it to place the parties in their original position. A ruling or order is interlocutory if it is not finally decisive of the case. * * * [citing authorities]."

In refusing to review an order fixing temporary alimony on an appeal from the subsequent dissolution decree, this court in *In re Marriage of Prybil,* 230 N.W.2d 487, 488 (Iowa 1975), made the following pertinent comments:

"Respondent now seeks to attack the allowance of temporary alimony as both unwarranted and excessive. We hold the matter is not reviewable on this appeal. The order directing payment of alimony pendente lite was final under Rule 331, Rules of Civil Procedure for purposes of

appeal. Having failed to appeal within the time permitted by Rule 335, R.C.P., respondent has waived his right to review.

"We said as much in *Walsmith v. Jackson*, 195 Iowa 630, 632, 192 N.W. 513, 514 (1923) where this appears:

" 'The application for [temporary] alimony, though not a separate suit, is a proceeding for a separate judgment, and when granted has nothing to do with the final judgment in the case and will not be affected by it. It is a final judgment in the sense that an appeal may be taken therefrom.'

"As illustrative of the many cases in which appeals have been taken as a matter of right from orders allowing temporary alimony, see *Hanford v. Hanford*, 214 Iowa 839, 240 N.W. 732 (1932); *Lindsay v. Lindsay*, 189 Iowa 326, 178 N.W. 384 (1920); *Eastman v. Eastman*, 159 Iowa 167, 169, 140 N.W. 400 (1913)."

The apparent majority of jurisdictions which have considered the appealability of an order granting temporary alimony are in accord with this court's statements in *Prybil*, and, in addition, have refused to differentiate between an order for temporary alimony and orders granting other temporary, financial assistance. The following from 27B C.J.S. Divorce § 284(1) b, pages 216–217, is supported by the accompanying citations therein:

"Orders as to alimony, and counsel fees, and orders with respect to allowance of suit money, and costs, pendente lite, and orders modifying an award of temporary alimony are generally held appealable. It has been held that such orders cannot be reviewed on appeal from the final judgment, or on certiorari where no appeals were taken from such orders. For the purpose of appeal, a proceeding for the allowance of temporary support or counsel fees in a divorce action is considered to be collateral to the main action, * * *."

In accord with the general rule set out above is the following from *Sarracino v. Superior Court of Los Angeles County*, 13 Cal.3d 1, 8–9, 118 Cal.Rptr. 21, 26–27, 529 P.2d 53, 58–59:

" * * * An order for temporary support is a final judgment for purposes of appeal. * * * [citing authorities]. Even if the principal action or proceeding is subsequently terminated by dismissal or abatement, the temporary support order remains enforceable as to amounts accruing prior to such termination. * * * [citing authorities]. An application for temporary support 'is heard and determined upon a record of its own' * * * [citing authority], and 'while not a separate action, is a proceeding for a separate judgment independent of the final judgment in the action' * * * [citing authority]. * * *. The provision of the order in the dissolution proceeding requiring petitioner to pay his wife's attorney's fees was 'in effect a final judgment against a party in a collateral proceeding growing out of the action.' * * * [citing authorities]. * * * Thus, petitioner's failure to appear after notice at the hearing on the application for temporary support put him in default for purposes of entering orders against him which have most of the attributes of final judgments." See also *Gladfelter v. Gladfelter*, 205 Ark. 1019, 172 S.W.2d 246, 247; *Greene v. Superior Court*, 55 Cal.2d 403, 10 Cal.Rptr. 817, 359 P.2d 249, 250; *Ahrens v. Ahrens*, 299 Ky. 497, 185 S.W.2d 694, 695; *Richardson v. Richardson*, 524 S.W.2d 149, 153 (Mo.App.1975); *Walker v. Walker*, 129 Mont. 295, 285 P.2d 590, 592; *Brady v. Brady*, 168 Pa.Super. 538, 79 A.2d 803, 804.

In light of the foregoing authorities we hold an order allowing temporary attorney fees in a dissolution action is a "final judgment" within the meaning of rule 331(a), R.C.P. (now rule 1(a), Rules of Appellate Procedure), and thus appealable as a matter of right. Accordingly, this court has jurisdiction of this appeal.

III. At this point, an additional preliminary issue must be dealt with. Sally maintains the only issue properly before this court at this time concerns the propriety of the amount of the temporary attorney fees awarded here. Specifically, she argues case law authority and this court's previous rulings in the present controversy require that

the issue of the existence of a marital relationship may only be reviewed by this court upon an appeal from a final dissolution decree entered in the district court. Petitioner relies upon *Hanford v. Hanford,* 214 Iowa 839, 240 N.W. 732, as support for her contention. In the cited case the court said:

"* * * In order to warrant an order granting temporary alimony, the fact of the marriage between the parties must be admitted or proven, or there must be proof submitted to create a fair presumption of the existence of the marital relation. * * [citing authorities]. The marriage relation need not be conclusively established, but, if the proof be such as to make out a fair presumption of the fact of the existence of the marital relation, then it is sufficient to warrant the court in granting an order for temporary alimony. * * * [citing authorities]." 214 Iowa at 841, 240 N.W. at 734.

Following the statements set out above, the *Hanford* court proceeded to review the evidence of record and held the proof therein was " * * * sufficient to create a fair presumption of the existence of the marital relation, and sufficient justification for the granting of an order for temporary alimony. * * * [citing authority]." 214 Iowa at 842, 240 N.W. at 734.

■ The *Hanford* decision does not support Sally's contention the extent of this court's review of the issue presented herein is limited to a consideration of the propriety of the amount of temporary attorney fees awarded to her. Rather, the pronouncements of the court in that decision are authority for our view that a preliminary determination as to the sufficiency of proof bearing on the existence of a marital relationship between the parties is inherent in and essential to an order granting temporary attorney fees.

■ As noted, petitioner points to this court's denials of John's previous applications for interlocutory appeal as support for her contention as to the extent of our review in this matter. Those rulings dealt solely with John's application for authority

to appeal from the trial court's finding a common law marriage existed between the parties. This finding of the trial court did not finally adjudicate Sally's right to a dissolution which was the relief sought by her in her petition. It was not a final judgment from which an appeal might be taken as a matter of right. Our rulings on John's applications for interlocutory appeal did not and could not affect his appeal as a matter of right from the trial court's order awarding temporary attorney fees which was a final judgment.

We are not persuaded to limit the extent of our review in this matter for the reasons urged by petitioner's foregoing arguments.

■ The trial court concluded John and Sally Winegard were husband and wife by virtue of a common law marriage. However, for purposes of determining the propriety of an order allowing temporary attorney fees in a dissolution proceeding, the marriage relation need not be established by a preponderance. If the proof be such as to make out a fair presumption of the fact of the existence of the marital relationship, then it is sufficient to warrant the court in granting an order for temporary attorney fees.

Consequently, our de novo review for the purpose of the present controversy will be limited to a quest for that quantum of evidence which creates a fair presumption of the existence of the marital relationship.

IV. In connection with this limited type of review we turn to some of the decisions of this court which recognize the principles applicable when a common law marital relationship is alleged.

Recently, in *In re Marriage of Grother,* 242 N.W.2d 1 (Iowa 1976), this court summarized those principles in these words:

"* * * The burden was on * * * [petitioner] as proponent of the marriage to prove it by a preponderance of evidence. * * * A claim of common-law marriage is regarded with suspicion and is closely scrutinized. It was necessary for * * * [petitioner] to prove an intent and agreement *in praesenti* to be married by both

parties together with continuous cohabitation and public declaration that they were husband and wife. * * * [citing authorities]." (Emphasis in original).

In *In re Estate of Dallman*, 228 N.W.2d 187, 190 (Iowa 1975), are the following pertinent comments:

"Although, as aforesaid, common-law marriages are recognized in this jurisdiction, one element essential to the proof of such relationship is a general and substantial 'holding-out' or open declaration thereof to the public by both parties thereto. * * * [citing authorities]. In fact such 'holding-out' or open declaration to the public has been said to be the acid test. * * * [citing authorities].

"In other words, there can be no secret common-law marriage. * * * [citing authorities]."

With respect to the requirement that the parties presently intend to be husband and wife, this court in *Gammelgaard v. Gammelgaard*, 247 Iowa 979, 980, 77 N.W.2d 479, 480, said:

" * * * To establish the existence of such a marriage there must be shown a present intent to be husband and wife, followed by cohabitation. * * * [citing authorities]. Proof of cohabitation is not in itself sufficient. * * * [citing authority]. But such proof, as well as evidence of conduct and of general repute in the community where the parties reside, is admissible as tending to strengthen a showing of a present agreement to be husband and wife, and as bearing upon the question of intent. * * * [citing authority]." See also *In re Estate of Wittick*, 164 Iowa 485, 493, 145 N.W. 913, 916.

The following additional comments upon the intent necessary to establish a common law marital relationship are contained in *McFarland v. McFarland*, 51 Iowa 565, 570, 2 N.W. 269, 273–274:

" * * * It is true that cohabitation does not of itself constitute marriage. On the other hand, no express form in this State is necessary more than at common law. * * * [citing authority]. It is suf-
ficient if the parties cohabiting intend present marriage, and it is immaterial how the intention is evidenced. The woman, indeed, may be entitled to marital rights if she intends present marriage, and the man does not, provided they cohabit and provided his conduct is such as to justify her in believing that he intends present marriage. * * * [citing authority]."

The above principles of law are well established and are not disputed by the parties herein. As is normally the case, the parties dispute various aspects of the other's evidence and the inferences based thereon. As in most litigation, some merit attaches to the contentions of each party. If there were no differing opinions, there would be no controversy. The total of the contentions of the respective parties must be added together and weight assigned thereto determined accordingly. Although weight will be given to the findings of the trial court this court will not abdicate its function as triers de novo on appeal. *Gammelgaard v. Gammelgaard*, 247 Iowa at 987, 77 N.W.2d at 484; *In re Estate of Fisher*, 176 N.W.2d 801, 807 (Iowa 1970).

The record discloses the following bearing on the existence of the marital relationship: (1) Sally's intent and belief with respect to her relationship with John; (2) opinions of various witnesses that the community generally regarded the parties as married; (3) continuous cohabitation by the parties since April of 1971; (4) John's failure to deny his alleged marriage; (5) John's acquiescence in Sally's use of his name and her representations to the community they were in fact married; (6) Sally's receipt of a wedding band from John; (7) hotel registrations and travel reservations wherein the parties were listed as Mr. and Mrs. John Winegard; (8) receipt of wedding gifts without objection by John; (9) payment by John of retail charge accounts incurred by Sally as Mrs. John Winegard; (10) mail received and sent by the parties as Mr. and Mrs. John Winegard; (11) John's consent to Sally's ownership of and designation as beneficiary under an insurance policy on his life wherein Sally was referred to as "in-

sured's wife;" (Petitioner's ex. # 22); and (12) checks endorsed by John directing payment to the order of "Sally Winegard." (Petitioner's ex. # 8, # 9).

John contends there is no direct evidence of an intent and agreement *in praesenti* by the parties to be husband and wife. Even assuming, as John maintains, Sally's testimony with respect to John's alleged statements on the return flight from Las Vegas is without credibility, it is well established circumstantial evidence may be relied upon to demonstrate a common law marriage. *In re Estate of Malli*, 260 Iowa 252, 256, 149 N.W.2d 155, 158; *State v. Lawson*, 165 N.W.2d 838, 839 (Iowa 1969); *In re Estate of Fisher*, 176 N.W.2d at 806. The record herein regarding the continuous cohabitation of the parties and the declaration or holding out to the public they were in fact husband and wife constitutes circumstantial evidence which tends to create a fair presumption that a common law marital relationship existed.

One final contention advanced by John in an attempt to refute the existence of a marital relationship between him and Sally centers upon the airborne conversation between them wherein John allegedly made reference to the recognition of common law marriages in Iowa. Specifically, John maintains that since that conversation, if it in fact took place, occurred in air space over a state other than Iowa, Sally has not demonstrated, as she must, that said unknown state recognizes common law marriages. John's contention is without merit. The actions of the parties, subsequent to the controverted airborne conversation, are sufficient to create the presumption required.

In light of the foregoing authorities we conclude from our de novo review the proof is sufficient to create a fair presumption of the existence of the marital relationship. Such quantum of evidence meets the standard required to justify the granting of an order for temporary attorney fees under the present factual circumstances.

Nothing we have said here is intended to prevent respondent from challenging the sufficiency of the evidence to establish a common law marriage in the event of an appeal from a final judgment on the merits in the dissolution proceeding.

V. John's final contention concerns the propriety of the amount of temporary attorney fees awarded Sally. He appears to challenge the award of $7,500 to Sally on two grounds. Initially John maintains Sally's application and the court's subsequent order resulted in an allowance for past legal services rendered in state and federal court which, John contends, is not contemplated by section 598.11, The Code, set out earlier herein. In addition, John challenges the award of attorney fees to Sally on the ground it was not necessary to enable her to prosecute this action, as is required by section 598.11.

John's initial argument is entirely without merit. He resisted Sally's application on the ground such an award would be inappropriate without a preliminary determination a marriage in fact existed. When that determination was made at the conclusion of the initial phase of the bifurcated proceedings, John commenced two abortive attempts to have that determination reviewed by this court and unsuccessfully sought federal court review of certain of this state's discovery rules. With the resolution of these judicial skirmishes, Sally was finally able to apply for an award of temporary attorney fees. Her pre-application legal expenses were necessitated by the peculiar posture of this litigation and John's litigious nature. Assuming, for the moment, Sally needed financial assistance in order to be able to prosecute this action, consideration by the trial court of her already incurred legal expenses was not improper.

As noted, section 598.11 provides for the allowance of temporary attorney fees "to enable such party to prosecute or defend the action." John maintains Sally was able to prosecute this action without the award of attorney fees to her.

Sally's application for temporary attorney fees, subsequently supplemented, contained an itemized listing of the services rendered by her attorney which amounted to approximately $26,000. As noted, the trial court allowed $7,500.

It should be noted Sally's brief devotes considerable time to the proposition she is entitled to the full amount of the legal services itemized in her application. However, Sally has not appealed from the order granting said fees and, consequently, cannot be awarded more herein. *Prestype Inc. v. Carr*, 248 N.W.2d 111, 121 (Iowa 1976).

Although this is an equity action and this court accordingly reviews the record de novo, considerable discretion is assigned to the trial court in the allowance of attorney fees. *McNamara v. McNamara*, 181 N.W.2d 206, 211 (Iowa 1970); *In re Marriage of Moorhead*, 224 N.W.2d 242, 245 (Iowa 1974); *In re Marriage of Lochmiller*, 229 N.W.2d 228, 229 (Iowa 1975). Bearing in mind the disparate financial circumstances of the parties involved and the complexity of the litigation the trial court's award was appropriate. Hence, John's contention is without merit.

VI. Sally requests an allowance for attorney fees incurred by her on this appeal. However, apparently, no itemized schedule of those services has been filed with this court. While this court's task is thus made more difficult, apparently, failure to file such a schedule is not fatal to Sally's request. See *In re Marriage of Gudenkauf*, 204 N.W.2d 586, 588 (Iowa 1973) and *In re Marriage of Dowie*, 215 N.W.2d 276, 278 (Iowa 1974). Hence, it would appear Sally should be awarded an amount to be used to offset the attorney fees incurred by her in defending the judgment below. In light of the complexity of this litigation and the issues presented herein, $1,000 would appear to be an appropriate amount.

VII. March 5, 1976, John filed with this court a motion requesting the costs involved herein be assessed against Sally. Said motion was based upon Sally's designation of items to be included in the appendix. Pursuant thereto, the entire transcript and all exhibits were made a part of the appendix. This court subsequently ordered the motion submitted for consideration with this appeal.

Rule 344.1, R.C.P. (now rule 15(b), Rules of Appellate Procedure), provides in pertinent part as follows:

"(a) * * *

"(b) *Determination of Contents: Cost of Producing.* The parties are encouraged to agree as to the contents of the appendix. In the absence of agreement, the appellant shall, not later than ten days after the date on which the appeal is docketed, serve on the appellee a designation of the parts of the record which he intends to include in the appendix and a statement of the issues which he intends to present for review. If the appellee deems it necessary to direct the particular attention of the court to parts of the record not designated by the appellant, he shall, within 10 days after receipt of the designation, serve upon the appellant a designation of those parts. The appellant shall include in the appendix the parts thus designated. *In designating parts of the record for inclusion in the appendix, the parties shall have regard for the fact that the entire record is always available to the court for reference and examination and shall not engage in unnecessary designation.*

"Unless the parties otherwise agree, the cost of producing the appendix shall initially be paid by the appellant, but if the appellant considers that parts of the record designated by the appellee for inclusion are unnecessary for the determination of the issues presented he may so advise the appellee and the appellee shall advance the cost of including such parts. The cost of producing the appendix shall be taxed as costs in the case, *but if either party shall cause matters to be unnecessarily included in the appendix the court may impose the cost of producing such parts on that party.*" (Initial emphasis in original).

Inclusion in the appendix of the entire transcript (three volumes) was pat-

ently unnecessary. Obviously, unnecessary matter was included therein. In similar circumstances a portion of the costs has been taxed to the party responsible therefor. *Hegtvedt v. Prybil*, 223 N.W.2d 186, 190 (Iowa 1974); *Jeager v. Elliott*, 257 Iowa 897, 910–911, 134 N.W.2d 560, 568. Petitioner is assessed one-half of the costs of printing the appendix. Other costs shall be taxed to the respondent.

■ VIII. Before oral argument in this court respondent filed an application for permission to amend and enlarge the appendix herein to include documents which were attached as exhibits to the application. The question as to whether permission should be granted was ordered submitted with this appeal. We have read the application and the documents attached and conclude said documents are primarily pertinent to the issue of the existence of a common law marriage. This issue was not reached in light of the view this court adopted in determining the record sufficiently established the existence of a common law marital relationship to justify an allowance of temporary attorney fees.

Consequently, respondent's application for permission to amend and enlarge the appendix herein is denied.

The order of the trial court allowing petitioner temporary attorney fees in this matter is—Affirmed.