In re the MARRIAGE of SCHISSEL.

Janet G. SCHISSEL, Appellant,

v.

John A. SCHISSEL, Appellee.

No. 2–63240.

Supreme Court of Iowa.

May 21, 1980.

Rehearing Denied June 16, 1980.

David L. Brown of Hansen, McClintock & Riley and James W. Carney of Carney, Hudson & Williams, Des Moines, and Ione G. Shadduck, West Des Moines, for appellant.

David F. Chambers, Des Moines, for appellee.

Considered by LeGRAND, P. J., and UHLENHOPP, HARRIS, McCORMICK and LARSON, JJ.

UHLENHOPP, Justice.

This appeal involves the economic terms of a marriage dissolution decree.

The parties were married in 1957 when they were in their early twenties. Respondent John A. Schissel was a First Lieutenant in the United States Air Force stationed in Burlington, Vermont. Petitioner Janet G. Schissel had just received a bachelor's degree from Drake University in Des Moines, Iowa. Neither party had property of significance. During the marriage two daughters were born to them, Stephanie in 1958 and Laura in 1960. Stephanie died in an automobile accident during the pendency of this appeal.

Janet did not have full-time employment outside the home while the girls were young; she accompanied John on various tours of duty in the Air Force. While married both parties attended school; John received a bachelor's degree from Iowa State University and both spouses received master's degrees from Drake University. Since 1966 Janet has been a physical education instructor at Drake University, where she presently receives $13,800 per year. She also receives approximately $2000 for teaching during the summer term. Janet's status as a Drake faculty member also entitles Laura to attend that school tuition-free; Laura was a freshman there at time of trial. John is presently employed by the State of Iowa at an annual salary of $23,-000. Janet's total financial contribution to the marriage amounted to $106,615, and John contributed $247,101. Their total net assets presently amount to approximately $140,000.

Although the parties are still in their mid-forties, they have both accumulated vested retirement benefits from their jobs. Under present computations, at 65 Janet will receive an estimated $670 per month through a Drake employee plan. John will be entitled to an estimated $646 per month in military retired pay beginning at age 60, and at age 65 he will receive an estimated $160 per month from the Iowa Public Employee Retirement System (IPERS). In addition, at present figures Janet will at age 65 be entitled to approximately $450 per month in social security, and John will receive approximately $510 per month from that source.

After trial the dissolution court dissolved the marriage and held that the marital property should be equally divided, no alimony should be awarded, the parties should retain their own retirement benefits except that John should pay Janet $8000 on account of his military retirement program, John should pay $175 per month and Janet $25 per month for Laura's support, and the parties should pay their own attorneys. Both parties appealed, Janet filing her notice of appeal first.

On appeal Janet asserts that the dissolution court gave insufficient consideration to John's military retirement benefits, that her $25 per-month child support obligation should be reduced, that the court should have awarded her rehabilitative alimony and attorney fees, and that this court should award her attorney fees on appeal. In his cross-appeal John contends that the dissolution court did not take into account

all of Janet's earnings in its determination of her monthly income, that it inequitably divided the parties' assets, that federal law prohibits the application of state family law to the disposition of his military retired pay, and that Janet should be required to pay more than $25 per month child support.

We review these cases de novo. *In re Marriage of Winegard*, 257 N.W.2d 609, 613 (Iowa 1977). We give weight to the dissolution court's fact findings but do not "abdicate [our] function as triers de novo on appeal." *Id.*

■ I. *Sufficiency of cross-appeal notice.* Preliminarily Janet contends that John's notice of cross-appeal was not sufficiently specific. We do not agree.

Iowa Rule of Appellate Procedure 6(a) provides in part that a notice of appeal "shall specify the parties taking the appeal and the decree, judgment, order or part thereof appealed from." We have stated regarding the forerunner of that rule:

> *Substantial compliance* with the provisions of rule 336 is sufficient. In considering the sufficiency of the content of the notice we now hold that if the intent of the appellant to appeal from a judgment may be inferred from the text of the notice and if the appellee has not been misled by the defect the appeal will be entertained. This more liberal rule of construction is consistent with our oft repeated preference for disposition of cases on the merits and not on mere technicalities.

*Hawkeye Security Insurance Co. v. Ford Motor Co.*, 199 N.W.2d 373, 378 (Iowa 1972) (citations omitted, emphasis in original).

The notice of cross-appeal in this case stated that "[r]espondent, John A. Schissel, hereby cross-appeals to the Supreme Court of Iowa, from the final Judgment and Decree of Dissolution entered herein on February 9, 1979, and all Rulings and Orders inhering therein." Janet does not claim that prejudice resulted from the alleged defect in the notice of cross-appeal, nor does the record indicate confusion regarding the portions of the judgment John appeals from. We hold the notice of cross-appeal sufficient under *Hawkeye. See also, Blink v. McNabb*, 287 N.W.2d 596, 599 (Iowa 1980). We thus approach the issues on the merits so far as necessary for decision, and we do so in somewhat different order than the parties present them.

■ II. *Determination of net income.* One of the issues John raises in his cross-appeal is whether the dissolution court erred in failing to consider as part of Janet's income her past summer earnings of $2000. The court did not err in this respect. Janet desires to increase her earning capacity by obtaining a doctorate in the physical education field while continuing her employment at Drake University. Such an endeavor will require her to study during the summer months rather than teach as she has in the past. Because she will not likely have summer teaching income in the near future, the court was justified in not taking that item into consideration.

■ III. *Property division.* Another argument John raises is that the court erred in dividing the parties' assets approximately in halves. John contends that because his efforts supplied approximately two-thirds of the income to the marriage, he should likewise receive two-thirds of the assets upon dissolution.

We have rejected a mechanical rule that each spouse *must* receive one-half of the marital assets, but we have recognized that equal division of marital property is often equitable. *See, e. g., In re Marriage of Wahl*, 246 N.W.2d 268, 271 (Iowa 1976); *In re Marriage of Anderson*, 243 N.W.2d 562, 564 (Iowa 1976); *In re Marriage of Ralston*, 242 N.W.2d 269, 271 (Iowa 1976). This is a proper case for an approximately equal division. Janet contributed to the marriage not only as a wage earner, but also as a homemaker and mother. Moreover, the necessity of making repeated moves during the first ten years of the marriage undoubtedly had an adverse effect on Janet's monetary earnings during those years. The dissolution court's division of the parties' assets appears just.

IV. *Military retirement benefits.* Both parties object to the manner in which the court handled John's military retirement program in the decree. Janet contends that the court's award of $8000 to her in lieu of any interest in that program is inadequate in view of the total value of the program. John argues that federal law prevents this court from applying Iowa family law to the disposition of his military retirement program. The issue has two aspects: *John's* military retired pay, and *survivors'* benefits. We deal first with the military retired pay.

■ A. We do not recognize community property in this jurisdiction, nor do we have a statute classifying certain assets as "marital" property. Our statute is purposely general: ·

> When a dissolution of marriage is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties *as shall be justified.* The order may include provisions for joint custody of the children of the parties. Orders relating to custody of children shall be subject to the provisions of chapter 598A [Uniform Child Custody Jurisdiction Act].
>
> Subsequent changes may be made by the court in these respects when circumstances render them expedient.

§ 598.21, The Code 1979 (emphasis added). Furthermore, we have not laid down rigid tests for applying this statute; we have prescribed general guidelines to assist dissolution courts in making such arrangements as are justified. *Schantz v. Schantz,* 163 N.W.2d 398, 405 (Iowa 1968).

If this state is not pre-empted from applying its family law to John's military retired pay, that pay may be considered in the financial terms of dissolution decrees under the *Schantz* criteria. Arguably the retired pay falls within the sixth postmarital guideline of *Schantz* ("Earning capacity of each party."). Certainly it falls within · the broad tenth guideline ("Any other relevant factors which will aid in reaching a fair and equitable determination as to respective rights and obligations of the parties."). Putting aside for the moment Jan-

et's contention that John's military retired pay was not given *sufficient* consideration, we take up the issue of whether federal law prevents state courts from giving consideration to military retired pay when formulating economic terms of dissolution decrees.

■ A distinction must be observed between a spouse's attempting to garnish a government or its officials to collect sums *from the government* due the other spouse, and a dissolution court's considering that governmental obligation when prescribing the economic terms of a dissolution decree *as between the spouses.* Under the sovereign immunity doctrine, a government or its officials ordinarily cannot be garnished, absent consent. *See Buchanan v. Alexander,* 45 U.S. (4 How.) 19, 20, 11 L.Ed. 857 (1846); *Applegate v. Applegate,* 39 F.Supp. 887, 889–90 (E.D.Va.1941); 6 Am.Jur.2d *Attachment & Garnishment* §§ 78, 79 (1963). (The Federal Government has given consent with respect to child support and alimony payments in 42 United States Code, section 659.) In the absence of statutory prohibition, however, a court can consider governmental obligations to a spouse in adjusting the equities between spouses in dissolution decrees. *See In re Marriage of Fithian,* 10 Cal.3d 592, 596, 111 Cal.Rptr. 369, 517 P.2d 449, 451, cert. denied, 419 U.S. 825, 95 S.Ct. 41, 42 L.Ed.2d 48 (1974) (taking military retired pay into consideration). *Accord, Ramsey v. Ramsey,* 96 Idaho 672, 676, 535 P.2d 53, 57 (1975); *Kruger v. Kruger,* 139 · N.J.Super. 413, 420, 354 A.2d 340, 344 (1976), *modified,* 73 N.J. 464, 375 A.2d 659 (1977); *LeClert v. LeClert,* 80 N.M. 235, 237, 453 P.2d 755, 757 (1969); *Mora v. Mora,* 429 S.W.2d 660, 662 (Tex.Civ.App.1968); *Payne v. Payne,* 82 Wash.2d 573, 576, 512 P.2d 736, 738 (1973). Where a statutory prohibition is claimed to exist, "[i]t is the ascertainment of legislative intent [in this situation, Congressional intent] that provides the solution to the problem." *Cose v. Cose,* 592 P.2d 1230, 1232 (Alaska 1979).

The instant litigation is in the family law field, and the subject under investigation is military retired pay under laws of the Federal Government. The specific question is

whether the federal statutes evince an intent that state dissolution courts cannot consider such pay in formulating dissolution decrees.

The general frame of reference in which the United States Supreme Court approaches federal benefit programs vis-a-vis state marriage dissolution proceedings was stated thus is *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 581, 99 S.Ct. 802, 808, 59 L.Ed.2d 1, 11 (1979):

Insofar as marriage is within temporal control, the States lay on the guiding hand. "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593–594, 10 S.Ct. 850, 853, 34 L.Ed. 500 (1890). Federal courts repeatedly have declined to° assert jurisdiction over divorces that presented no federal question. See, e. g., *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930). On the rare occasion when state family law has come into conflict with a federal statute, this Court has limited review under the Supremacy Clause to a determination whether Congress has "positively required by direct enactment" that state law be pre-empted. *Wetmore v. Markoe*, 196 U.S. 68, 77, 25 S.Ct. 172, 176, 49 L.Ed. 390 (1904). A mere conflict in words is not sufficient. State family and family-property law must do "major damage" to "clear and substantial" federal interests before the Supremacy Clause will demand that state law be overridden. *United States v. Yazell*, 382 U.S. 341, 352, 86 S.Ct. 500, 507, 15 L.Ed.2d 404 (1966).

John claims Congress intended in its military retired pay legislation that state dissolution courts cannot take such pay into consideration, and he relies on *Hisquierdo* and on a post-*Hisquierdo* state case which so holds, *Cose v. Cose*, 592 P.2d 1230 (Alaska 1979).

*Hisquierdo* does hold that dissolution courts may not consider retired pay, but the pay involved was under the Railroad Retirement Act. In arriving at its decision the Court emphasized two of the Act's provisions. One was section 231m of 45 United States Code:

Notwithstanding any other law of the United States, or of any State, Territory, or the District of Columbia, no annuity or supplemental annuity shall be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated.

The Court referred to this provision as "critical" and stated, 439 U.S. at 583, 99 S.Ct. at 809, 59 L.Ed.2d at 11–12 (citations omitted):

Section 231m plays a most important role in the statutory scheme. . . . [I]t ensures that the benefits actually reach the beneficiary. It pre-empts all state law that stands in its way. It protects the benefits from legal process "[n]otwithstanding any other law . . . of any State." Even state tax-collection laws must bow to its command, for Congress added that phrase in an amendment designed in part to ensure that neither federal nor state tax collectors would encroach on the distribution of benefits.

The Railroad Retirement Act provides a benefit for a railroad worker's spouse in addition to the worker. The second provision of the Act emphasized in *Hisquierdo* was section 231d(c)(3) of 45 United States Code:

The entitlement of a spouse of an individual to an annuity . . . shall end on the last day of the month preceding the month in which . . . the spouse and individual are absolutely divorced.

Of this provision the Court stated, *id.* at 585, 99 S.Ct. at 810, 59 L.Ed.2d at 13:

The choice was deliberate. When the Act was revised in 1974, a proposal was made to award a divorced spouse a benefit like that available to a divorced spouse under the Social Security Act. The labor-management negotiation committee, however, rejected that proposal, and Congress ratified its decision. It based its conclusion on the perilous financial state of the Railroad Retirement Account, and the need to devote funds to other purposes.

Of the statutory plan involved in *Hisquierdo*, the Court concluded, *id.*:

Congress has made a choice, and § 231m protects it. It is for Congress to decide how these finite funds are to be allocated. The statutory balance is delicate. Congress has fixed an amount thought appropriate to support an employee's old age and to encourage the employee to retire. Any automatic diminution of that amount frustrates the congressional objective. By reducing benefits received, it discourages the divorced employee from retiring. And it provides the employee with an incentive to keep working, because the former spouse has no community property claim to salary earned after the marital community is dissolved. Section 231m shields the distribution of benefits from state decisions that would actually reverse the flow of incentives Congress originally intended.

Examination of military retired pay legislation reveals a substantially different history and purpose, and different specific provisions. Thus we do not find a provision in this legislation comparable to section 231m relied on in *Hisquierdo* ("no annuity or supplemental annuity shall be . . . subject to . . . legal process under any circumstances whatsoever, nor shall the payment thereof be anticipated"), or like section 231d(c)(3) ("The entitlement of a spouse . . . shall end on the last day of the month preceding the month in which . . . the spouse and the individual are absolutely divorced"). Military retired pay is treated in the Code more as ordinary income; thus it is taxable as such. 26 U.S.C. § 61(a)(11).

To achieve a just result between dissolving spouses, we would ordinarily take military retired pay into consideration if not federally proscribed. 24 Am.Jur.2d *Divorce & Separation* § 632 (1966). The question here is whether the general rationale applies that "the States lay on the guiding hand" in family law matters, or whether the military retired pay legislation reveals Congressional intent to override state law. Under the general rationale, state law is pre-empted only where Congress has "'positively required by direct enactment'" that it shall not apply and where state law does "'major damage' to 'clear and substantial' federal interests . . . ." *Hisquierdo*, 439 U.S. at 581, 99 S.Ct. at 808, 59 L.Ed.2d at 11. After comparing the railroad retirement and military retired pay legislation, we conclude that state law has not been superseded in the situation of military retired pay. In this we find support in the post-*Hisquierdo* decisions of two other appellate courts. *Czarnecki v. Czarnecki*, 123 Ariz. 466, 466, 600 P.2d 1098, 1098 (1979); *In re Marriage of Musser*, 70 Ill.App.3d 706, 709, 27 Ill.Dec. 240, 243, 388 N.E.2d 1289, 1292 (1979).

We respectfully decline to follow the opposing case of *Cose v. Cose*, 592 P.2d 1230 (Alaska 1979). In this connection we note the *Cose* court stated that "only a widow, not a surviving ex-wife is eligible for benefits," citing 10 United States Code, section 1434(c). The cited section however relates to the Serviceman's Family Protection Plan. That plan is different from the Survivor Benefit Plan, which is intended eventually to replace the other plan. *See* [1972] U.S. Code Cong. & Admin.News, pp. 3288, 3294. The Survivor Benefit Plan permits a serviceman under certain circumstances to appoint any "[natural] person with an insurable interest" as an annuity beneficiary. The section does not expressly state that a former spouse could not have an insurable interest, and we note than an ex-spouse may have such an interest. *Cf. Lynch v. Bogenrief*, 237 N.W.2d 793, 797 (Iowa 1976) (individual entitled to alimony has insurable interest in former spouse). We also note the appeal to equity in the special concurrence in *Cose, id.* at 1233 (Matthews, J.):

As a matter of state law it is clear that retirement pay must be considered in dividing marital property. AS 09.55.210(6) requires that property acquired during marriage be divided "in the manner as may be just" and in so deciding we have consistently required consideration of the financial circumstances of each party. *E. g. Merrill v. Merrill*, 368 P.2d 546, 547–48 n. 4 (Alaska 1962); *Malone v. Malone*, 587

P.2d 1167 (Alaska 1978). Often the major asset of a retired military family is the husband's retirement pay. To award that to the husband and divide the remaining assets between husband and wife as if the retirement benefit did not exist is to ignore the husband's financial circumstances. It is also plainly unfair to the wife.

We thus hold that the dissolution court rightly took John's military retired pay into consideration when it added $8000 to Janet's share in the property division.

■ We do not agree with Janet's assertion, however, that the court gave insufficient consideration to John's military retired pay when it awarded her $8000. First, Janet uses the total figure of military retired pay John will probably receive in the future, but she is receiving the adjustment of $8000 now; thus the court properly used a lesser present value in its consideration of this item. Again, we would be more inclined to agree with Janet if the only retirement benefits available to either party were John's military retired pay, but the parties have other retirement benefits which must be considered. Under present figures at age 65 Janet will receive approximately $450 per month in social security benefits as well as $670 per month in retirement benefits as a teacher, for a total of $1120 per month. John will receive at age 65 approximately $510 per month in social security benefits, $160 per month from IPERS, and $646 per month in military retired pay, for a total of $1316. Thus the disparity between their respective retirement benefits at age 65 will be something less than 15 percent. John earned about 1200 of his 3770 military "retirement points" prior to his marriage to Janet, whereas Janet earned all of her retirement benefits after her marriage to John. On the other hand, John will begin receiving his military retired pay at 60, whereas the other retirement benefits are computed as of age 65. After considering all of these factors, however, we agree with the court's addition of $8000 to Janet's share and its response to Janet's request for a portion of John's military retired pay:

Both parties are young people, both have excellent educations, both have potential of many future years of productive life. It would not be in the best interest of either to tie their futures together beyond their duty to assist their children to gain further education. Bearing such in mind, together with the uses to which cash in hand may be put, the Court concludes that a lump sum allowance [of $8000] would best serve the requirements of equity . . . .

Petitioner and Respondent have both acquired retirement programs through their present employment. It appears to the Court that each should retain all rights thus acquired, and that the Court should not disturb the same.

■ B. Janet also objects to the court's refusal to consider separately the Survivor Benefit Plan provided in sections 1431 through 1455 of 10 United States Code (military retired pay may be reduced to provide a survivor annuity). She asserts that John "could have executed a Designation of Beneficiary which would provide for the Petitioner's receiving annuity benefits beginning the day after Respondent's death, whether before or after age 60 . . . . [T]his would guarantee receipt of benefits subsequent to the retiree's death." Presumably Janet would have us order John to designate her as beneficiary of an annuity.

The statutory provisions governing the Survivor Benefit Plan prevent us from appointing Janet as a beneficiary if we were otherwise inclined to do so. Section 1450(a) identifies the possible recipients of a survivor's annuity. It provides in part:

[A] monthly annuity under section 1451 of this title shall be paid to—

(1) the eligible widow or widower;

(2) the surviving dependent children in equal shares, if the eligible widow or widower . . . becomes ineligible under this section; or

(3) the dependent children in equal shares if the [retired serviceman] elected to provide an annuity for dependent children but not for the spouse; or

(4) the natural person designated under section 1448(b) of this title ·. .. ..

Janet contends she could qualify as an eligible beneficiary under subsection (4) ("the natural person designated under section 1448(b)"). But section 1448(b) deals only with a person who has an "insurable interest" in the serviceman. Janet no longer has such an interest in John. *Lynch*, 237 N.W.2d at 797 (insurable interest requires a pecuniary interest in the life of another). The dissolution decree effects a complete financial settlement between these spouses, and we believe that approach is appropriate. The court factored in this item when it allowed Janet $8000 at the present time.

■ V. *Rehabilitative alimony.* Janet contends the court erred in refusing her "rehabilitative alimony." She sought that alimony to assist her in obtaining a doctorate. A Drake administrative officer testified that such a degree is prerequisite to significant increases in her salary of $13,800.

We agree with the dissolution court that rehabilitative alimony is not warranted on these facts. Janet has indicated an intent to begin pursuit of a doctorate by attending summer school, at least until Laura finishes her studies at Drake. The court took the resultant loss of summer income into consideration when it computed her annual income for the purpose of the decree. While degree candidates are at some point required to attend school full time on a resident status, a witness testified that most educational institutions require only one year of residency. We commend Janet for her intention to improve herself by further education but believe she will be able to finance her summer studies and a year of extraordinary expense out of her share of the assets which the court divided in its decree. We therefore decline to modify the decree in this respect.

■ VI. *Child support.* Both parties contend that the court erred regarding child support. Janet insists that she should not be required to pay $25 per month toward Laura's support in view of the tuition waiver benefit which accrues to Laura by virtue of Janet's employment as a Drake teacher. John insists that Janet's $25 per month support obligation is not enough in view of his own monthly payment of $175 and section 597.14 of the Code, which provides that both parents are liable for the support of the children.

We are not inclined to disturb the order regarding child support. We enumerated factors to be considered in *In re Marriage of Zoellner*, 219 N.W.2d 517, 525 (Iowa 1974) (citations omitted):

> Factors to be considered are parties' age, health, present earning capacity, future prospects, amount of resources owned by each or both parties, contributions of each to the joint accumulations, the children involved, duration of the marriage, indebtedness of each or both, and any other relevant factors which might assist the trial court in reaching a just and equitable decision.

After weighing these factors under this record, we approve the terms of the decree regarding child support.

■ VII. *Attorney fees.* Janet contends that the court should have awarded her attorney fees for the trial and also asks that we award them for the appeal. She cites John's alleged refusal to consider any out-of-court division of his military retired pay.

■ We decline to reverse the court's decision with regard to attorney fees, and we do not award them for this appeal. Dissolution courts have considerable discretion respecting attorney fees. *See McNamara v. McNamara*, 181 N.W.2d 206, 211 (Iowa 1970). Although we have considered the litigious nature of a party in awarding fees, *In re Marriage of Winegard*, 257 N.W.2d 609, 617 (Iowa 1977), we do not believe that John should be considered litigious for refusing voluntarily to divide his military retired pay. The pre-emption question we have addressed is, as Janet herself points out, "an issue of law of first impression" in this jurisdiction, on which neither party could predict the outcome with assurance. Moreover, the record indi-

cates some attempts at negotiation on the retired pay issue. As the dissolution court found, both parties are able to pay their legal expenses.

We see no reason to alter the decree. AFFIRMED.